(No. 96299.—

*In re* MARY ELIZABETH GORECKI, Attorney, Respondent.

*Opinion filed November 20, 2003.*

Rosalyn B. Kaplan, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Sheila M. Finnegan and Sarah A. Stofferahn, of

Mayer, Brown, Rowe & Maw, of Chicago, and William J. Martin, of Oak Park, for respondent.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

The respondent in this attorney discipline case, Mary Elizabeth Gorecki, concedes that she violated the Illinois Rules of Professional Conduct when she left three messages on a telephone answering machine which falsely indicated that the president of the Kane County board could be bribed into providing a county job. At issue in this case is the appropriate sanction to impose for this misconduct. For the reasons that follow, we suspend respondent's license to practice law for a period of four months.

## BACKGROUND

In February 2001, the Administrator of the Illinois Attorney Registration and Disciplinary Commission (ARDC) filed a complaint before the Hearing Board (see 166 Ill. 2d R. 753(b)) which alleged that respondent left three messages on a telephone answering machine stating that a county job could be obtained from the chairman of the Kane County board, Mike McCoy, if payments were made to McCoy under the guise of "campaign contributions." The complaint alleged that the three messages were false, in that respondent had no reason to believe that a job could be obtained by making payments to McCoy, and, further, that respondent knew that making payments to McCoy to secure employment with Kane County would be illegal or improper. Based on the alleged misconduct, the respondent was charged with: (1) stating or implying an ability to improperly influence a tribunal, legislative body, government agency, or official in violation of Rule 8.4(a)(6) of the Illinois Rules of Professional Conduct (155 Ill. 2d R. 8.4(a)(6)); (2) engaging in conduct involving dishonesty, fraud, deceit, or

misrepresentation in violation of Rule 8.4(a)(4) of the Illinois Rules of Professional Conduct (155 Ill. 2d R. 8.4(a)(4)); and (3) engaging in conduct that tends to defeat the administration of justice or bring the courts or legal profession into disrepute in violation of Supreme Court Rule 771 (134 Ill. 2d R. 771).

A disciplinary hearing was held before the Hearing Board in November 2001. Evidence presented before the Hearing Board established the following facts.

Respondent has been licensed to practice law in this state since November 1991. From 1991 to 1996, she served as an assistant State's Attorney in the Kane County State's Attorney's office. In 1996, respondent entered private practice where she concentrated on commercial matters. In September 1999, respondent announced her candidacy for the office of State's Attorney of Kane County. In March 2000, respondent won the primary election and, in November 2000, she was elected Kane County State's Attorney. Respondent was serving as the State's Attorney of Kane County at the time of this appeal.

Sometime in 1998, while she was in private practice, respondent was contacted by Jane Morrison, a deputy sheriff in Kane County and the sister of a longtime friend of respondent. At the disciplinary hearing, Morrison testified that she called respondent seeking help in getting a job for her boyfriend, Eric O'Neil. O'Neil had earlier applied for a job as a highway maintainer for the Kane County department of transportation but had not received an offer.

According to Morrison, respondent stated that she would make some phone calls and get back to her. Sometime thereafter, respondent phoned Morrison and left three messages on Morrison's home answering machine. The messages were recorded on a cassette tape, which Morrison kept. The recorded messages were played

for the Hearing Board and a transcript of the messages was admitted into evidence. The first message stated:

"Hey Jane, I talked to uh two people uhm, the first person I talked to uhm who, you know, allegedly works inside uh, started talking about Eric's interview, and you know said something like oh 'He didn't interview well ...' And I said I heard he interviewed great and you know I ... I just said and I heard there like you it's allegedly test scores and there weren't scores and this and that and the other thing and so I just said okay thanks for the information. I talked to I went back to my primary source, he just said, 'Meg, quit f—in' around, get the money together and do it if you're gonna do it, uhm just meet with your client, get the money, set up an appointment with McCoy, you know, uhm, sit down, talk to Eric about it uhm, you know.' There are no guarantees in life but he said this is the only way to get it done. If you want the job done uh, you take the bull by the horns and uh you offer him the money, you know. Of course, there are no ... you make 'campaign contributions.' That's what I meant to say ... (laughs). Give me a call uh I'll be in and out this weekend. Uh (cuts off) ... ."

The first message was cut off because of a time limitation on the answering machine. The second message began immediately thereafter:

"Jane, I don't know when your birthday is or when Eric's birthday is but the two of you like need to buy each other a new answering machine, like very soon, cause like I cannot take the music. Anyway, I talked to Mike McCoy, uhh he's on board, everything's uh squared up. The only thing he's getting back to me on is whether or not there are any positions left. Just that simple. Uhm (inaudible) highway, street maintenance, snow removal, etc., and he goes you know Meg, I think we've filled the three spots and I said I heard there were six, blah, blah, blah. We went back and forth he's gonna get back to me today or Monday. I'll talk to ya. Bye."

Morrison testified that, sometime after the second message, she had an unrecorded phone conversation with respondent. During this conversation, respondent

explained how the bribery scheme would work. According to Morrison, respondent told her that an attorney-client contract would be completed and that a check for 10% to 15% of O'Neil's annual salary, somewhere between $4,000 to $6,000, would be written to respondent's law firm. This sum would then be broken down into increments of less than $1,000 and would go into Mike McCoy's campaign fund in the name of various contributors. Morrison recalled that respondent expressed regret that Morrison's mother, an alderman in Aurora, did not get along with McCoy because respondent could otherwise use the mother's name as one of the contributors.

Within two weeks of the first recorded messages, Morrison received a third and final message on her answering machine:

"Uh, guy who got it is from Big Rock. I didn't get his name, but he, he was hired, but he doesn't start, he hasn't started yet, and that's why no one knows his name, apparently, 'cause he's not working day-to-day with the cronies yet. He starts mid-September, allegedly, and, as I said, it's some guy from Big Rock. Um, I was also told that they potentially have two more spots. Um, whether or not those are even gonna be posted, they don't know. Um, and this other guy I talked to said I'm wasting my time unless I go, ya know, straight to McCoy. He said if there's gonna be two more spots, it's gonna be up to McCoy to open those up, ya know, financially, through whatever budgeting process they had originally budgeted, 'cause I guess your numbers are right. Like they had six spots budgeted. Now four are ... ."

At the disciplinary hearing, Morrison testified that she was shocked by respondent's suggestions about bribing McCoy and did not follow them. Morrison stated that she kept the tape-recorded messages until February 2000 when she turned the answering machine tape over to the Kane County's sheriff's office. This led to investigations by, among others, the sheriff's office, the ARDC and a special prosecutor.

Although the primary election campaign for Kane County State's Attorney was underway in February 2000, when Morrison turned over the answering machine tape, Morrison denied that the timing of the delivery of the tape was politically motivated. Morrison testified that she waited more than a year to give the tape to her superiors at the sheriff's office because, during that time, she was experiencing a difficult pregnancy and was having marital problems. She explained that, once she returned from maternity leave, she gave the tape to the sheriff's office. According to Morrison, the fact that the primary election campaign was going on was coincidental.

On cross-examination, Morrison was asked whether she knew which candidate for State's Attorney her mother had supported in the primary election. Morrison stated that she did not know. Morrison's testimony was then impeached with an earlier deposition in which she stated that she knew her mother was supporting respondent's opponent in the election. Morrison also acknowledged on cross-examination that she was in possession of the answering machine tape well before her pregnancy began in January 1999, and that she continued to work as a deputy sheriff until the eighth month of her pregnancy, in September 1999. Morrison also conceded that when she first spoke to the Kane County sheriff's department about the answering machine tape in February 2000, and recounted the unrecorded telephone conversation she had with respondent, she did not include two details: (1) that respondent had discussed creating an attorney-client contract and (2) that a specific sum of between $4,000 and $6,000 would be paid to respondent.

Mike McCoy, chairman of the Kane County board since 1996, testified by way of videotaped deposition. McCoy stated that, in Kane County, a highway maintainer's job was to plow snow and do other miscellaneous jobs

pertaining to the county highways. Applicants for the position of highway maintainer were required to take a test and were interviewed by a panel, who then ranked the applicants. McCoy stated that his only input into the process of hiring highway maintainers was to ensure that special consideration was given to minority applicants.

McCoy stated that in 1998 or 1999 the highway department had six vacancies for the job of highway maintainer. McCoy testified that shortly after these vacancies were filled, respondent contacted him and stated that she had a client who was interested in one of the positions. Respondent did not identify the client. McCoy stated that he told respondent that no jobs were available, but respondent said she thought two positions were still open. McCoy then told respondent that he would get back to her. He did not do so, however, and nothing further occurred.

McCoy testified that he had never met or heard of Eric O'Neil before February 2000, when reports of respondent's taped messages appeared in the press. McCoy stated that he had read transcripts of the messages left on Morrison's answering machine and that respondent's references to him were false. McCoy also stated that he had never accepted a bribe and that he considers himself to be an honest civil servant. McCoy acknowledged that he is often asked to and does recommend people for various county jobs. However, he stated that no new employee was ever expected to kick back any money to him or to make payments to a political party or to a political campaign.

When asked whether respondent's statements damaged his reputation or hurt him politically, McCoy answered that he did not think so. McCoy stated that he did not think that "anyone really believed" respondent's statements. McCoy noted that he ran unopposed in the election for Kane County board chairman and that he obtained the second highest vote total in Kane County.

The parties stipulated that a special prosecutor was appointed to investigate persons implicated in the recorded messages. The special prosecutor filed a report which provided, in part, that no evidence existed that McCoy had ever engaged in the illegal or dishonest conduct described in respondent's telephone messages and that the matter was closed without convening a grand jury.

Respondent testified at her disciplinary hearing. When asked about the messages on the answering machine and her conversations with Morrison, her recollection was somewhat limited. She recalled that Morrison contacted her about finding a job for O'Neil. She also recalled stating to Morrison that she would make some calls and that she did not, in fact, do so. Respondent did not remember, however, any of the details of her conversations with Morrison or the timing of the messages she left Morrison.

Respondent acknowledged leaving the messages on Morrison's answering machine. She stated repeatedly that she had no explanation for the messages and that she could not "even imagine" saying those words. Respondent denied having any psychological or substance abuse problems at the time she left the messages. Respondent acknowledged that, in an earlier statement, she had indicated that she left the messages in an effort to get Morrison to stop calling her about getting a job for O'Neil. At the disciplinary hearing, however, respondent stated that this was not true. Respondent further admitted that the statements she made to Morrison were false and that she did not talk to anyone about obtaining a job for O'Neil.

Respondent spoke to a reporter about the phone messages in March 2000. Respondent admitted that she was not entirely candid in her responses to the reporter. She stated that she responded with a "knee-jerk" political

reaction to the reporter's inquiries and that she was "completely defensive and rationalizing all of it." In September 2000, respondent held a press conference in which she acknowledged that she made the fabricated statements to Morrison but stated that the messages on the tape had been "taken out of context." Respondent testified that, at the time of the press conference, she was "still trying to rationalize or give it some explanation" and that she did not then have the courage to take full responsibility for her actions.

Respondent also admitted that she was not forthright in responding to an initial request for information sent by the ARDC in April 2000. Respondent stated that she did not understand how serious the charges were and, further, that the denials contained in her response to the ARDC were rationalizations. Respondent submitted a supplemental response to the ARDC in August 2000, in which she took full responsibility for the statements on the tape, admitted that the statements were fictitious and apologized for her improper conduct.

Respondent apologized repeatedly before the Hearing Board for her actions. She stated that she has never given anyone a bribe, has never accepted a bribe, and has not been the subject of any prior ARDC complaints or letters of inquiry. She expressed remorse and dismay for her conduct and stated that her statements to Morrison were the most horrible thing she has ever done and the worst thing she could have done to the legal profession. Respondent stated that she had apologized to Mike McCoy but believed that no apology was sufficient for what she had done. She also stated that she came to the disciplinary hearing to make a public apology. She expressed hope that her reputation and standards had "shown through."

Several witnesses attested to respondent's good character and reputation. Substantial evidence was also

introduced showing that respondent had a long history of community and charitable activities.

At the conclusion of the disciplinary hearing, the Hearing Board found that the Administrator had proved by clear and convincing evidence that respondent had engaged in the misconduct as charged. After weighing the mitigating evidence against the severity of the misconduct, the Hearing Board recommended a six-month suspension. The dissent recommended censure. Respondent filed exceptions. The Review Board affirmed the findings of misconduct but recommended a two-month suspension. The Administrator filed exceptions to this court.

## ANALYSIS

Before this court, respondent concedes that her conduct in leaving the three phone messages on Morrison's answering machine violated the Rules of Professional Conduct, as charged by the Administrator. Further, although respondent argued before the Review Board that censure was the appropriate sanction in this case, she has since abandoned that position. Like the Administrator, respondent now agrees that a suspension is warranted for her misconduct. Thus, the only point of disagreement between the parties in this case is the appropriate length of the suspension to be imposed. The Administrator argues that a year's suspension is in order, while respondent contends that a two-month suspension (the disposition recommended by the Review Board) is appropriate.

The purpose of attorney discipline is not punishment. Rather, attorney discipline is undertaken to protect the public, to maintain the integrity of the profession, and to protect the administration of justice from reproach. *In re Spak*, 188 Ill. 2d 53, 67-68 (1999), quoting *In re Fox*, 122 Ill. 2d 402, 410 (1988). In determining the appropriate sanction to impose, we must consider the nature of

respondent's misconduct and any aggravating or mitigating circumstances. *In re Lidov*, 129 Ill. 2d 424, 430 (1989). We may also consider the deterrent value of a sanction and whether the sanction will help preserve public confidence in the legal profession. *In re Discipio*, 163 Ill. 2d 515, 528 (1994). The disciplinary recommendations of the Hearing Board and Review Board are advisory only. The ultimate responsibility for imposing discipline rests with this court. *In re Eckberg*, 192 Ill. 2d 70, 85 (2000).

In considering the nature and severity of respondent's misconduct, the parties dispute whether this court should take into account Morrison's testimony regarding the unrecorded phone conversation in which respondent allegedly stated that, to facilitate the bribery scheme, an attorney-client contract would be completed and that a sum of between $4,000 to $6,000 would be conveyed to respondent's law firm. Respondent contends that the unrecorded conversation was not specifically mentioned in the Administrator's complaint and, therefore, the conversation constitutes uncharged conduct that should not be considered by this court. Moreover, according to respondent, neither the Hearing Board nor the Review Board made any express finding regarding the conversation. Respondent further notes that, unlike the other statements for which the Administrator seeks to sanction respondent, the conversation describing the details of the bribery scheme was not recorded. Respondent contends that Morrison's description of the unrecorded conversation changed from when she first described it to the Kane County Sheriff's office, with the description becoming more detailed over time. Respondent also argues that Morrison's actions with respect to respondent were politically motivated and that her testimony regarding the unrecorded conversation was not credible. Accordingly, respondent maintains that the testimony should not be considered by this court.

The Administrator disagrees. The Administrator contends that the unrecorded conversation was not uncharged conduct because the complaint referenced, in addition to the phone messages, "a series of conversations" between Morrison and respondent. Further, citing to People ex rel. Chicago Bar Ass'n v. Goodman, 366 Ill. 346, 349 (1937), the Administrator maintains that a disciplinary complaint need not plead the evidence. The Administrator also observes that respondent was the only other party to the conversation with Morrison and that, in her testimony before the Hearing Board, respondent never denied that the conversation took place. The Administrator maintains that there is no reason why this court should not consider Morrison's testimony in full and that the testimony, along with the phone messages, describe a "detailed and elaborate" bribery scheme which merits a severe sanction.

Initially, we note that, although it was not stated as an express finding, the Hearing Board concluded that much of Morrison's testimony regarding the unrecorded conversation was corroborated by her previous statements. After describing Morrison's testimony, the Hearing Board noted that the report of the interview conducted by the Kane County sheriff's office when Morrison first turned over the answering machine tape had been admitted into evidence. That report, according to the Hearing Board, "confirmed Morrison's testimony" that she had been told by respondent that O'Neil would have to contribute 10% to 15% of his salary, that the money would be given to respondent and that respondent would break the money down into four smaller donations to McCoy's campaign fund. Neither the Administrator nor respondent mention this statement by the Hearing Board or address its significance.

In any event, however, even if we were to set the testimony regarding the unrecorded conversation aside,

as respondent asks us to do, we do not believe the seriousness of respondent's misconduct would be materially affected. The gravamen of respondent's misconduct in this case is not found in any particular detail contained in her statements, *e.g.*, whether she mentioned an attorney-client contract. Rather, it is found in the general message which those statements conveyed. Although it is undisputed that respondent, in fact, never spoke to McCoy about receiving kickbacks from O'Neil and that McCoy was never "on board" with any bribery scheme, there is nothing of record to indicate that respondent was anything less than serious in suggesting to Morrison that she should attempt to bribe McCoy. Thus, even limiting the misconduct to the three phone messages, as respondent contends we should, we are left with the salient fact that respondent's statements endorsed, and even encouraged, the bribing of a public official. As respondent herself admits, the phone messages, by themselves, violate the Rules of Professional Conduct. Respondent's statements are unquestionably a very serious matter and we view them as such in deciding the appropriate sanction here.

The parties also dispute whether the seriousness of respondent's misconduct may be gauged by the impact it had upon Mike McCoy. Respondent points to McCoy's testimony that he suffered no harm to his reputation and that, in his election for chairman of the Kane County board (which took place after respondent's statements became public), he received the second highest vote total in Kane County. From this, respondent argues that McCoy suffered "no actual harm" and, therefore, that it would be inappropriate to consider the effect of respondent's conduct upon McCoy in measuring the seriousness of her actions. We reject respondent's argument for two reasons.

First, after Morrison turned the answering machine

tape over to the Kane County sheriff's office, a special prosecutor was appointed to investigate the matters raised by the tape. As a person mentioned on the tape, McCoy was a principal subject of this investigation and was questioned by the special prosecutor as to his involvement in any illegal conduct. Except for respondent's statements, McCoy would not have had to endure the inconvenience and stress of the special prosecutor's investigation. It is incorrect, therefore, to say that respondent's statements had no harmful effect whatsoever upon McCoy. Second, and more importantly, part of the reason that falsely accusing a public official of being amenable to bribery is viewed as serious misconduct is because it places the reputation of that innocent official at risk. See, *e.g.*, *Office of Disciplinary Counsel v. Atkin*, 804 Ohio St. 3d 383, 704 N.E.2d 244 (1999). In this case, it was fortunate that, for whatever reason, respondent's statements caused no lasting damage to McCoy's reputation or his political fortunes. However, this fortuitous outcome does not mean that it would be appropriate to eliminate all consideration of Mike McCoy in measuring the seriousness of respondent's misconduct.

Respondent's statements, which were widely publicized and which prompted the appointment of a special prosecutor, created a genuine risk to McCoy's reputation. The reality of this risk is underscored by the fact that respondent was a former assistant State's Attorney. As the Review Board noted, as a former assistant State's Attorney, respondent "had, and would have been perceived as having, a greater level of awareness of the workings of public officials; thus, her representations as to their integrity, or lack thereof, carried greater potential weight." We have previously held that attorney discipline should be "closely linked to the harm caused or the unreasonable risk created by the [attorney's] lack of care." *In re Saladino*, 71 Ill. 2d 263, 276 (1978). In this

case, we believe that the risk of harm to McCoy's reputation created by respondent's statements was unreasonable and may be properly considered in assessing the seriousness of her misconduct.

In addition to contesting the inherent seriousness of respondent's misconduct, the parties also dispute whether certain other factors may be weighed in aggravation against her. The parties disagree, for example, as to whether respondent's failure to provide an explanation for the phone messages should be considered an aggravating factor. In this regard, the Hearing Board stated the following:

> "Respondent's total lack of explanation for her messages to Morrison during the hearing also is disturbing to us and must play a part in our assessment of her character. Despite a plea on our part for any rationale for her words, none was forthcoming. Although we are tempted to suggest a reason for her behavior, and several have come to mind, it is not within our province to speculate on her motivation. Suffice it to say that we find it difficult to accept her claim that she has a complete and total lack of recall regarding the timing and intent of the taped messages."

The Review Board disagreed with the above statement. According to the Review Board, if respondent "had attempted at the hearing to provide reasons for her conduct, these attempts might well have been perceived as a rationalization and undermined the sincerity of her remorse. Alternatively, if the acts are viewed as aberrant or irrational, then an attempt to rationally explain these acts long after the event is an unrealistic burden." Thus, the Review Board concluded that respondent's "failure to state a reason for her statements was immaterial" to the consideration of the appropriate sanction in this case.

Before this court, the parties now dispute which of the above positions is correct. The Administrator argues in favor of the Hearing Board's position, while respondent urges us to adopt the position of the Review Board. In

our view, respondent and the Review Board have misapprehended the significance of the Hearing Board's conclusions.

The Hearing Board was not asking for respondent to provide nonexistent reasons for her conduct. The Hearing Board was explicit about what it found troubling, stating: "we find it difficult to accept [respondent's] claim that she has a complete and total lack of recall regarding the timing and intent of the taped messages." In other words, the Hearing Board did not find respondent credible when she testified that she could not remember why she left the messages on Morrison's answering machine. Deference is given to the Hearing Board on questions of credibility (*Spak*, 188 Ill. 2d at 66), and a lack of candor before the Hearing Board is a factor that may be considered in aggravation (see generally *In re Stillo*, 68 Ill. 2d 49 (1977)). Respondent's inability to provide an explanation for the messages, because it was not believed by the Hearing Board, is a factor that must be given some weight against her.

In its report, the Hearing Board also made the following statement:

> "As impressed as we are with the testaments to Respondent's character, we believe that those attestations are somewhat undercut by the lack of candor displayed by Respondent when she initially was confronted with her misdeeds. Respondent's deceptive responses to the media and the Administrator is an aggravating factor that casts some doubt not only on her integrity but also on her ability to acknowledge her mistakes. Although she stated that she was 'rationalizing' her actions and responded with a 'knee-jerk' reaction, we believe that her rationalizations continued far beyond any length of time during which she could claim to be startled or confused by the disclosure of the taped messages."

The Review Board agreed with the Hearing Board that respondent's deceptive response to the ARDC's initial inquiry could be considered in aggravation.

Respondent does not dispute this point. Accordingly, respondent's response to the ARDC weighs against her in determining the appropriate sanction here.

However, the Review Board rejected the Hearing Board's position regarding respondent's statements to the media. According to the Review Board, "statements to media, by a political candidate, should not be judged as strictly as statements to a court, client, or the ARDC. Additionally, given the context of media inquiries, some level of latitude must be afforded to the person responding. *** Responses to media questions, especially in the context of a heated political campaign, generally should not be given much if any weight in aggravation in a disciplinary case. This is particularly true where, as here, those responses are attempts to exculpate oneself from accusations that, at the time, may have legitimately appeared to be politically motivated."

Once again, the parties dispute whether the Hearing Board or Review Board was correct. Again, we conclude that respondent and the Review Board have missed the import of the Hearing Board's position.

Respondent first spoke to the media about the phone messages in March 2000. At the disciplinary hearing, respondent testified that she was not entirely candid in her statements at that time and that she responded with a "knee-jerk" political reaction. In September 2000, respondent held a press conference in which she acknowledged that she made the fabricated statements to Morrison. Even then, however, respondent stated that the messages on the tape had been taken out of context. Respondent testified that, at the time of the press conference, she was "still trying to rationalize" her behavior and that she had not yet taken full responsibility for her actions. Based on these facts, the Hearing Board concluded that respondent's public denials of wrongdoing "continued far beyond any length of time during which

she could claim to be startled or confused by the disclosure of the taped messages" and that her denials cast "some doubt not only on her integrity but also on her ability to acknowledge her mistakes."

Clearly then, it was the length of time that respondent continued to rationalize her behavior that troubled the Hearing Board. The Hearing Board was in no sense saying that off-the-cuff responses to the media should be judged under the same standards as statements made in court. Although, in the context of this case, we do not give it a great deal of weight, we agree with the Hearing Board's conclusion that the length of time it took respondent to accept responsibility for her statements may be considered in evaluating respondent's character and determining the appropriate sanction.

Balanced in mitigation against the foregoing misconduct and aggravating factors is what both the Hearing Board and Review Board accurately termed an "impressive" history of charitable and community activities on the part of respondent. Without question, respondent has devoted a tremendous amount of time to serving the Kane County community. Among other things, respondent has, for the past 10 years, volunteered at a homeless shelter, the Hesed House, at least once a month and on many holidays; worked with severely handicapped children; served for over 10 years on the Rosary High School board of trustees; volunteered for $2^{1}/_{2}$ years with the Child Advocacy Center, to help with fund-raising for and sponsoring of needy families; volunteered time for other charitable organizations, including "Two Women for Women" (a breast cancer organization), Court Appointed Special Advocates, the Cancer Society, the Tri-City Family Counseling Center, Hospice, Boy Scouts, Exchange Club, Rotary, Kiwanis and Toys for Tots. Respondent also founded in 1994, and has participated in until the present, an organization called "Prevent Child

Abuse Kane County," which educates people about child abuse; taught and lectured in community colleges and high schools on a volunteer basis, sometimes as an unpaid substitute teacher, about law and government; served on the Kane County Sexual Assault Task Force; and developed a cable television program called "Family Advocacy," in which respondent had a doctor, police officers, and counselors discuss ways of dealing with problems that can lead to court intervention, such as abuse, and physical and mental problems.

Further mitigation in this case was provided by several character witnesses. A judge, a high school teacher who administers a scholarship fund with respondent and who has known her for 18 years, and an attorney who was the head of the Kane County Child Advocacy Center all testified to respondent's reputation for honesty and integrity. Significantly, their opinions of respondent were not changed by the misconduct committed by respondent which is at issue here.

Finally, respondent offered compelling testimony on her own behalf at the disciplinary hearing. Respondent, who had not previously been disciplined, accepted full responsibility for her actions. She expressed deep remorse for the statements she made to Morrison. She also apologized to the ARDC, the legal profession, her constituents and to Mike McCoy. Both the Hearing Board and the Review Board considered respondent's expressions of remorse and acceptance of responsibility to be genuine and credible. We agree with this assessment.

We turn then to the appropriate sanction to impose in this case. The Administrator cites numerous decisions both from this court and from other jurisdictions to support its contention that the misconduct in this case warrants a suspension of one year. The cases cited are distinguishable, however, either in terms of the actual misconduct committed or in the number of aggravating and mitigating circumstances which are present.

The facts of this case are unique. Respondent did not commit any crime, she took no money, and she took no action to further a bribery or kickback scheme. Her misconduct is contained solely in the statements she made to Morrison. Nevertheless, those statements, as respondent concedes, violated the Rules of Professional Conduct. Representations such as those made by respondent undermine public confidence in the integrity of the government and, in conjunction with the aggravating factors discussed above, merit a suspension.

Like the Hearing Board, we do not want to lose sight of the fact that, although the misconduct in this case is quite serious, respondent has otherwise "led what appears to be an exemplary life devoted to assisting others." We are in agreement with many of the conclusions reached by the Hearing Board. We do, however, weigh the mitigating evidence more heavily than perhaps the Hearing Board did. We emphasize, in particular, that given respondent's character evidence, her years of good works, and her genuine expressions of remorse and acceptance of responsibility, that there is little likelihood of misconduct from respondent in the future. See *In re Mason*, 122 Ill. 2d 163, 173-74 (1988). Taking into account the serious nature of the offense and the evidence in mitigation and aggravation, we conclude that a four-month suspension is the appropriate sanction in this case.

## CONCLUSION

For the forgoing reasons, we suspend respondent's license to practice law for a period of four months.

*Respondent suspended.*