# Illinois Official Reports

## Supreme Court

---

### *In re Edmonds*, 2014 IL 117696

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* JOHN P. EDMONDS, Attorney-Respondent. |
| Docket No. | 117696 |
| Filed | November 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An attorney was suspended from the practice of law for three months based on the serious violations of commingling in connection with his client trust account, neglect of an estate which resulted in its interest liability on overdue taxes, and misrepresentations to representatives of a church which was an estate beneficiary. |
| Decision Under Review | Disciplinary proceeding. |
| Judgment | Respondent suspended. |

Counsel on
Appeal

Susan Frederick Rhodes and Jerome E. Larkin, of Chicago, for the Attorney Registration and Disciplinary Commission.

Thomas P. McGarry, David E. Jones and Thomas P. Sukowicz, of Hinshaw & Culbertson LLP, of Chicago, for respondent.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Thomas, Kilbride, Karmeier, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1     The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a complaint against respondent, John P. Edmonds, charging him with professional misconduct. The Hearing Board found that respondent, as trustee of a charitable trust, breached his fiduciary duty to various entities and individuals. The Hearing Board also found that respondent engaged in dishonest conduct with respect to the trust beneficiary and another person, neglected an estate matter associated with the trust, and commingled his own funds with client or third-party funds in his client trust account. The Hearing Board recommended that respondent be suspended from the practice of law for one year.

¶ 2     A divided panel of the Review Board affirmed in part and reversed in part. The Review Board upheld the Hearing Board's findings that respondent violated the Illinois Rules of Professional Conduct (Rules) by mishandling the estate matter and commingling funds. However, the Review Board reversed the Hearing Board's findings of breach of fiduciary duty and dishonest conduct. The Review Board recommended that respondent be suspended for 60 days. This court allowed the Administrator's amended petition for leave to file exceptions. Ill. S. Ct. R. 753(e) (eff. Dec. 7, 2011).

¶ 3                              I. BACKGROUND

¶ 4     Respondent was admitted to the Illinois bar in 1975, and has lived in Peoria since 1976. In 1989, respondent and his family moved to the Moss-Bradley area of Peoria, and became members of St. Mark Roman Catholic Church (St. Mark's). Respondent had been active in both the neighborhood residential association and the parish. Respondent has been a sole practitioner since 1991.

¶ 5     Respondent knew that John P. Sloan was a longtime Peoria attorney. Sometime prior to June 1998, respondent received a letter from Sloan. They had not previously met, and respondent did not know how Sloan found him. In the letter, Sloan asked respondent to assist in rewriting Sloan's will, and to provide ideas for a vehicle by which Sloan could benefit St. Mark's. Respondent met with Sloan, and they began working on a will and charitable

- 2 -

trust. They eventually became close friends, and respondent learned that Sloan had graduated from St. Mark's school. At Sloan's request, respondent worked on the will and trust *pro bono*.

¶ 6      During this work with Sloan, respondent knew Lance Hannah. In 1982, Hannah was admitted to the Illinois bar. However, in 1992, he was suspended from the practice of law for one year for neglecting and misrepresenting client matters, failing to maintain a client trust account, and commingling. In 1994, Hannah was suspended for 18 months and until further order of this court for: failing to comply with Illinois Supreme Court Rule 764 (eff. Aug. 27, 1990) after his 1992 suspension, neglecting a client's civil appeal, and engaging in the unauthorized practice of law after his name had been removed from the Master Roll of Attorneys for failing to pay his annual registration fee. Hannah has not sought reinstatement.

¶ 7      Respondent was unaware of Hannah's disciplinary status. Respondent then believed that Hannah was a licensed attorney and an expert in estate planning. Respondent and Hannah had worked together on some estate matters, including the drafting of wills. Also, Hannah had been working at American Express. Having complete trust in Hannah, respondent talked with him many times regarding different types of investments. Respondent introduced Hannah to Sloan. The three of them met and discussed the formation of Sloan's charitable trust. During this time, Sloan transferred some of his assets to American Express for Hannah's management. Two of Hannah's investments for Sloan significantly increased in value in a relatively short time.

¶ 8      On June 11, 1998, Sloan executed his will, in which he made small bequests to various individuals, and bequeathed the remainder of his estate to the "John F. Sloan Perpetual Charitable Trust" (Sloan Trust or trust). Sloan nominated respondent to be executor of his estate and South Side Trust and Savings Bank, in Peoria, to be successor executor.

¶ 9      The trust agreement was executed on the same date. It declared Sloan's intent to create a charitable trust that conformed to federal and Illinois law. The trust would be used exclusively for charitable purposes, exempt from federal income tax, and would qualify as a private foundation. Further, the trust agreement declared Sloan's intent to "specifically benefit St. Mark Roman Catholic Church and grade school" by providing funds for: additional school personnel compensation; scholarships, books, supplies, and equipment; repairs and maintenance; and property acquisition as needed.

¶ 10      The trust agreement granted the trustee broad fiduciary powers. The trustee was authorized to "make distributions at such times and in such manner" as not to subject the trust to federal income tax. The trust agreement authorized the trustee to sell trust property, to borrow money, and to litigate or settle any demand in favor of or against the trust. Regarding investments, paragraph 6.5 of the trust agreement granted the trustee the following power:

> "To invest in bonds, common or preferred stocks, notes, options, common trust funds, mutual funds, shares of any investment company or trust or other securities, in partnership interests, general or limited, joint ventures, real estate, or other property of any kind, regardless of diversification and regardless of whether the property would be considered a proper trust investment, except that no principal or income shall be loaned, directly or indirectly, to the trustee or anyone else, corporate or otherwise, who has made a contribution to this trust, and any loan shall bear a market rate of interest and be secured as to its full value."

Further, the trustee was granted the powers of an owner of the securities held in trust, and the power to take any action to conserve the value of trust assets.

¶ 11    The trust agreement named Sloan as trustee, and respondent and the bank, respectively, as successor trustees. While Sloan was alive, respondent was Sloan's attorney. In 1998, the trust held real estate valued at $300,000 and mutual funds valued at $750,000, with a total fair market value of approximately $1.1 million. In 1999, Sloan contributed to the trust additional assets valued at approximately $1.7 million. At the end of 1999, the fair market value of trust assets, which still consisted of mutual funds and real estate, was approximately $3.36 million. During Sloan's personal trusteeship, income from the trust provided $55,315 to St. Mark's school in 1999.

¶ 12    In 1999 and 2000, Hannah was the financial advisor to the American Express account that held the assets of the Sloan Trust. Sometime in 1999 or early 2000, Hannah discussed Range Energy, Inc. (Range Energy or Range), with respondent and Sloan. Formerly doing business as Range Petroleum, Range Energy was a publicly traded corporation based in Calgary, Alberta, Canada. The company was involved in the exploration and production of oil and natural gas. On January 28, 2000, respondent received a letter from Hannah suggesting possible investments for the Sloan Trust. Hannah stated that he could not give a "formal" recommendation to invest in Range Energy because the company was too small for American Express Financial Advisers to follow. "However, as we have discussed," stated Hannah, Range Energy appeared to be a good investment. Hannah stated that Sloan had already endorsed using 10% of the trust assets to purchase stock in Range Energy, and the "remainder of the trust would likely be [invested] in mutual funds." There was no discussion of investing 100% of the trust assets in Range Energy.

¶ 13    Sloan died on February 5, 2000, and respondent assumed the duties of executor of Sloan's estate and trustee of the Sloan Trust. An estate account was opened with American Express, which continued to hold the Sloan Trust assets. According to respondent's testimony, he received trustee's fees, and "also was paid money out of the estate," which he deposited into his law office operating account.

¶ 14    At respondent's direction, the Sloan Trust and Sloan's estate began to buy Range Energy stock. In a series of purchases from February 7 through March 1, 2000, the trust bought 933,000 shares of Range Energy costing approximately $556,000. On March 31, Sloan's estate bought 100,000 shares of Range Energy.

¶ 15    In response to a request for a financial statement of the Sloan Trust, respondent sent a letter dated April 11, 2000, to the pastor of St. Mark's. Attached to the letter was the trust's financial statement for the period March 15 through March 31, 2000. The statement indicated the Range Energy holding, several mutual funds, and a money market fund, all of which totalled approximately $2.3 million. Respondent did not send any subsequent trust financial statements to St. Mark's.

¶ 16    A June 2000 memorandum of understanding reflected "part of a larger agreement" between the Sloan Trust and Range Energy. In exchange for its investment, the trust obtained an interest in various Range Energy ventures. Respondent sent approximately $580,000 in cash directly to Range Energy. He received no receipt or other documentation to show that the money was a trust investment. In July 2000, respondent transferred the funds in Sloan's estate account to the account for the Sloan Trust.

¶ 17        Also during 2000, respondent and Hannah created the "2000 Oil and Gas Fund" (2000 Fund) to obtain additional investors in Range Energy. Respondent was the attorney for the 2000 Fund, and he accepted receipt of investment capital on behalf of the 2000 Fund and forwarded the money to Range Energy. All of the investors in the 2000 Fund were Hannah's relatives or acquaintances. Respondent made the Sloan Trust a member of the 2000 Fund. As of December 2000, investors had provided several hundred thousand dollars to the 2000 Fund.

¶ 18        On December 1, 2000, the 2000 Fund entered into a Production Sharing Agreement with Range Energy. Hannah recommended the agreement as a means of accelerating Range Energy's development, and respondent executed the agreement as attorney for the 2000 Fund. The agreement provided that in exchange for C$4 million, Range Energy would provide the 2000 Fund with the rights to certain percentages of the output of various oil and natural gas reserves which Range Energy claimed to have established, and Range Energy would make interest payments to the investors during the term of the agreement. Further, 2000 Fund investors would be entitled to a full refund if Range Energy did not meet specified reserve levels within two years.

¶ 19        From December 1, 2000, through February 9, 2001, respondent transferred approximately $2.1 million in additional assets of the Sloan Trust to Range Energy in fulfillment of the Production Sharing Agreement.[1] In sum, from Sloan's death in February 2000 through February 2001, respondent invested all of Sloan's personal assets and almost all of the trust assets into Range Energy. By December 2002, the Sloan Trust owned 1,603,768 shares of Range Energy. Also, respondent personally invested approximately $3,100 in Range Energy stock, and he bought $1,000 to $1,200 worth of stock for each of his two sons; his wife also invested approximately $1,200 in Range Energy stock. In February 2005, the funds in the American Express account for the Sloan Trust were depleted and the account was closed.

¶ 20        In March 2003, the British Columbia Securities Commission suspended trading of Range Energy stock and issued a cease-trading order to Range Energy because it failed to file various required documents including financial statements and quarterly reports. Range defaulted on the Production Sharing Agreement. Respondent attempted to resolve the default through correspondence and a meeting with Range's board of directors in Canada. In May 2003, unbeknownst to respondent, one of the 2000 Fund investors, Linn Biggs, filed a Canadian lawsuit on behalf of the 2000 Fund investors, including the Sloan Trust, against Range. In June 2003, the Canadian court entered judgment against Range in the amount of C$14,233,259.

¶ 21        In April 2005, respondent signed a forbearance agreement between the Sloan Trust and Range Energy. Under the agreement, the trust would take a subordinate position as a debtor to any person who provided new capital to Range Energy. Also, the trust agreed not to seek payment of its C$14 million judgment, but rather only two payments of $1 million to satisfy the judgment. However, Range Energy had no ability to pay the $2 million even if the trust sought it.

---

[1]In February 2001, Hannah left American Express Financial Advisors to become Chief Financial Officer of Range Energy. In March 2002, Hannah became President and Chief Executive Officer of Range Energy.

¶ 22    Despite its shifting assets, the Sloan Trust maintained its distributions to St. Mark's during respondent's trusteeship. In 2000, St. Mark's received $121,004 from the Sloan Trust. In 2001, St. Mark's received an average monthly distribution of $13,750 for a total of $165,000. In 2002, St. Mark's received $13,750 per month for a total of $165,000. The monthly distribution varied from year to year, such that St. Mark's received $123,540 in 2003, $123,120 in 2004, and $120,780 in 2005.

¶ 23    On August 30, 2005, respondent met with the pastor of St. Mark's and a parish trustee. The parish leaders asked where the Sloan Trust assets were invested. Respondent explained that since the purpose of the trust was a perpetual legacy, his focus had been on the school's long-term goals. Therefore, he shifted trust assets from the equity holdings during the trust's early years to oil and natural gas. As an outgrowth of the August 2005 meeting, respondent sent St. Mark's pastor a "Report on the Assets of John F. Sloan Perpetual Charitable Trust" (August 2005 Report). The August 2005 Report stated that the trust held a 20% interest in Range Energy and "various additional equity holdings," despite respondent having sold all of the original holdings in the Sloan Trust and invested the money in Range Energy, and having closed the American Express account for the trust in February 2005. The August 2005 Report also stated that the overall trust value was approximately $3 million and that "the health of the trust is good and the value of the trust has not significantly changed" since September 2001. However, respondent did not inform St. Mark's that Range Energy had breached its duty to make interest payments pursuant to the Production Sharing Agreement.

¶ 24    In 2006, the Sloan Trust monthly distributions were sporadic. It was not until March that St. Mark's received a $10,000 check designated for January, an April check designated for February, and a May check designated for March. In June 2006, Father Charles Klamut became pastor of St. Mark's. He asked to meet with respondent to discuss the Sloan Trust. Respondent and Hannah met with Father Klamut and gave him a copy of the August 2005 Report. Respondent told Father Klamut that the trust had a temporary cash flow problem that would resolve itself and result in greater returns for the Sloan Trust. After the 20-minute meeting, Father Klamut had believed that the trust was in good health, and he had no suspicions regarding respondent's trusteeship.

¶ 25    On October 25, 2006, Bret Taylor, an attorney and parish trustee, faxed to Father Klamut a document entitled "Brief Overview of Sloan Trust." Taylor advised the pastor that: all trust distributions are made at the discretion of the trustee; the trust does not require a specific amount of money to be distributed at any specific interval; "[t]here is no specific requirement to provide anyone, including beneficiaries or those standing as representative[s] of beneficiaries, an accounting or reporting of the financial status of the Trust"; and "[t]he Trustee has essentially full power to do whatever [the trustee] feels appropriate to do regarding Trust principle and income, so long as it is done in good faith, with the general purpose of the Trust in mind."

¶ 26    St. Mark's did not receive any more distributions in 2006. St. Mark's received a check in February 2007 designated April 2006 in the amount of $10,000. Thus, St. Mark's total distribution designated for 2006 was $40,000. In April 2007, the principal of St. Mark's school and a parish leader wanted to meet with respondent to find out what regular distributions St. Mark's could expect from the Sloan Trust, and whether St. Mark's could use some of the trust principal for a new building project. They met with respondent and Hannah,

who told them that the trust assets were tied up in an investment with Range Energy and that the funds were unavailable for a potential St. Mark's building campaign.

¶ 27    Distributions resumed in June 2007 and continued through December 2007. St. Mark's received $2,000 per month, for a 2007 total of $14,000. Father Klamut decided to demand a more detailed accounting of the Sloan Trust assets. Taylor wrote a letter to respondent inquiring about the health of the Sloan Trust and its sole investment in Range Energy. The letter requested an accounting of the trust and a financial statement for Range Energy. In March 2008, Taylor telephoned respondent as a follow-up to the letter and recent telephone conversations between respondent and Father Klamut. Respondent told Taylor that he had already provided Father Klamut and the previous pastor a description of the Sloan Trust assets, referring to the August 2005 Report, and that he would not provide St. Mark's with any further information.

¶ 28    Father Klamut contacted Patricia Gibson, an attorney and the chancellor of the Peoria diocese. In June 2008, Gibson wrote a letter to respondent, to which he replied. Respondent described Range Energy's activities and attached the August 2005 Report. Respondent did not address Gibson's requests for specific accounting information. In 2008, St. Mark's received $2,000 monthly distribution checks from January through June, and $3,000 checks for July and August. St. Mark's last distribution check of record was for $2,000 dated September 23, 2008, making the 2008 total distribution $20,000.[2]

¶ 29    On September 24, 2008, St. Mark's filed suit against respondent, seeking an accounting, damages, his removal as trustee, and the appointment of the successor trustee. In October, respondent resigned as trustee of the Sloan Trust. In April 2009, the successor trustee closed the Sloan Trust account, having a balance of $1,149. In May 2011, the civil suit between St. Mark's and respondent was resolved in a confidential settlement agreement.

¶ 30    In June 2010, the Administrator filed a seven-count complaint against respondent. Count I alleged that respondent's actions constituted a conflict of interest in violation of Rule 1.7(b) (Ill. R. Prof. Conduct R. 1.7(b) (eff. Aug. 1, 2001)). Count II alleged that respondent's misrepresentations regarding the source of the monthly checks constituted dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(a)(4) (Ill. R. Prof. Conduct R. 8.4(a)(4) (eff. July 6, 2001)). Count III alleged that respondent's misrepresentations regarding the financial health of the trust constituted a conflict of interest and dishonesty. Count IV alleged that respondent engaged in a conflict of interest by entering into the forbearance agreement without obtaining the consent of, or even informing, church or school officials. Count V alleged that respondent failed to act with reasonable diligence in handling Sloan's estate in violation of Rules 1.3 (Ill. R. Prof. Conduct R. 1.3 (eff. Aug. 1, 1990)) and 8.4(a)(5) (Ill. R. Prof. Conduct R. 8.4(a)(5) (eff. July 6, 2001)). Counts I through V additionally charged that respondent's alleged actions constituted breaches of fiduciary duty owed to the Sloan Trust and Sloan's estate, St. Mark's, and church and school officials. Count VI alleged that respondent engaged in dishonesty with a 2000 Fund investor. Count VII alleged that respondent commingled funds in his client trust account in violation of Rule 1.15 (Ill. R. Prof. Conduct R. 1.15 (eff. Dec. 1, 1998)). Also, the Administrator alleged in each count that respondent's alleged misconduct constituted conduct "which tends to defeat the

---

[2]The monthly distributions that St. Mark's received from 1999 through 2008 totaled $947,759.

- 7 -

administration of justice or to bring the courts or the legal profession into disrepute," in violation of Rule 770 (Ill. S. Ct. R. 770 (eff. Apr. 1, 2004)).

¶ 31   Proceedings before the Hearing Board, which included testimony, exhibits, and other submissions, elicited the above-recited evidence. The Hearing Board found that respondent engaged in most of the misconduct alleged in the complaint. However, the Hearing Board found that the Administrator failed to prove by clear and convincing evidence the allegations of conflict of interest. After considering evidence in aggravation and mitigation, the Hearing Board recommended that respondent be suspended from the practice of law for one year.

¶ 32   Respondent filed exceptions to the report and recommendations of the Hearing Board with the Review Board. The Review Board unanimously concluded that the allegations of breach of fiduciary duty did not constitute attorney misconduct because they did not arise out of an attorney-client relationship. Further, a majority of the Review Board concluded that the representations of respondent to church officials and a 2000 Fund investor did not constitute attorney misconduct. Accordingly, the Review Board reversed the findings of the Hearing Board as to counts I, II, III, IV, and VI. Additionally, the Review Board overturned the Hearing Board's findings in each count that respondent violated Rule 770.[3]

¶ 33   However, the Review Board unanimously upheld the findings of the Hearing Board as to respondent's neglect of Sloan's estate as charged in count V,[4] and respondent's misuse of his client trust account as charged in count VII. The Review Board recommended that respondent be suspended from the practice of law for 60 days. The case is now before us on the Administrator's exceptions to the findings and recommendations of the Review Board. Additional pertinent background will be discussed in the context of our analysis of the issues.

¶ 34                                II. ANALYSIS

¶ 35   Before this court, the Administrator and respondent each assign error to various findings, conclusions, and recommendations of the Hearing and Review Boards. In an attorney disciplinary proceeding, the Administrator bears the burden of proving the allegations in the complaint by clear and convincing evidence. *In re Thomas*, 2012 IL 113035, ¶ 56; *In re Timpone*, 208 Ill. 2d 371, 380 (2004). The Hearing Board determines whether the Administrator has met this burden. *In re Winthrop*, 219 Ill. 2d 526, 542 (2006). The findings of fact made by the Hearing Board are to be treated virtually the same as the findings of any initial trier of fact. *In re Cutright*, 233 Ill. 2d 474, 488 (2009). The Hearing Board is afforded deference because it is in the best position to observe the witnesses' demeanor, judge their credibility, and resolve conflicting testimony. *In re Storment*, 203 Ill. 2d 378, 390 (2002). Accordingly, this court will generally not disturb the Hearing Board's factual findings unless they are against the manifest weight of the evidence. *Timpone*, 208 Ill. 2d at 380. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Cutright*, 233 Ill. 2d at 488.

---

[3]See *In re Thomas*, 2012 IL 113035, ¶ 92 (holding that an attorney does not violate Rule 770 *per se*, but "becomes subject to discipline pursuant to Rule 770 upon proof of certain misconduct").

[4]The Review Board reversed the Hearing Board's findings of breach of fiduciary duty in count V as "duplicative and unnecessary."

¶ 36    Although the Hearing Board's findings of fact are afforded deference, this court is responsible for correcting errors in the application of those facts to the law. *Winthrop*, 219 Ill. 2d at 543. We review *de novo* questions of law, including the interpretation of supreme court rules. *Storment*, 203 Ill. 2d at 390.

¶ 37                                    A. Administrator

¶ 38    The Administrator contends that respondent committed attorney misconduct by: (1) breaching his fiduciary duty to the Sloan Trust and Sloan's estate, and St. Mark's and its representatives, as alleged in counts I, II, III, and V[5]; (2) engaging in dishonesty with church and school officials, as alleged in counts II and III; and engaging in dishonesty with a 2000 Fund investor, as alleged in count VI.

¶ 39                          1. *Breach of Fiduciary Duty: Karavidas*

¶ 40    Counts I, II, III, and V of the complaint charged that respondent's alleged actions constituted breaches of fiduciary duties that respondent owed to various entities and their representatives. In November 2011, the Hearing Board found against respondent as charged. However, in December 2012, the Review Board concluded that these charges were without basis in law because the alleged circumstances did not involve an attorney-client relationship. The Administrator filed in this court a petition for leave to file exceptions to the findings and recommendations of the Review Board. The Administrator took exception to the Review Board's dismissal of the remaining charges of breach of fiduciary duty.

¶ 41    In November 2013, this court decided *In re Karavidas*, 2013 IL 115767. We agreed with "the proposition that an attorney's breach of fiduciary duty *** does not, standing alone, warrant the imposition of professional discipline." *Id*. ¶ 78. We held that "professional discipline may be imposed only upon a showing by clear and convincing evidence that the respondent attorney has violated one or more of the Rules of Professional Conduct. Mere bad behavior that does not violate one of the Rules is insufficient." *Id*. ¶ 79.

¶ 42    In December 2013, the Administrator filed a motion for leave to amend his petition for leave to file exceptions. The proposed amended petition purportedly deleted the arguments contained in his original petition assigning error to the Review Board's dismissal of the breach of fiduciary duty charges, and purportedly presented arguments consistent with *Karavidas*. On March 14, 2014, this court entered an order that denied the amended petition without prejudice to refile. Ill. S. Ct. M.R., 25901 (eff. Mar. 14, 2014). Our order expressly directed the Administrator to review the above-discussed holding in *Karavidas* "and not pursue exceptions to the Review Board's findings" pertaining to respondent's alleged breach of fiduciary duty as a ground for discipline.

¶ 43    Despite this court's order, the Administrator continues to seek discipline based on respondent's conduct as trustee and executor without basing the charge on a specific alleged violation of a Rule of Professional Conduct. The Administrator's brief is replete with argument based on the legal theory of breach of fiduciary duty rather than specific

---

[5]The Administrator has not excepted to the Review Board's recommended dismissal of the breach of fiduciary duty allegation in count IV.

disciplinary rules. In keeping with our March 14, 2014, order, we do not address this issue.

¶ 44                    2. *Dishonesty: St. Mark's Representatives*

¶ 45      Count II of the complaint alleges several instances of what the Administrator characterizes as respondent's intentional misleading in violation of Rule 8.4(a)(4). Ill. R. Prof. Conduct R. 8.4(a)(4) (eff. July 6, 2001). Three such occurrences are before us.

¶ 46      In January 2003, the Sloan Trust had insufficient liquid assets to make that month's distribution to St. Mark's. Respondent maintained a business line of credit at Wells Fargo, which he used to pay various office expenses. On January 3, 2003, respondent borrowed $13,750 from his business line of credit and deposited it in his client trust account. Respondent then drew a check on his client trust account payable to the Sloan Trust in the amount of $13,750, and deposited it in the Sloan Trust account. Respondent then sent St. Mark's its monthly check drawn on the Sloan Trust account. Respondent did not inform church officials that he had borrowed money from his business line of credit to make the Sloan Trust's January 2003 distribution.

¶ 47      The trust also had insufficient liquid assets to make its February 2003 distribution to St. Mark's. On January 22, 2003, respondent deposited into his client trust account a check for $30,000, which had been drawn on a personal account controlled by Hannah. Respondent then drew a check on his client trust account payable to the Sloan Trust in the amount of $13,750. Respondent then sent St. Mark's its February 2003 distribution. Respondent did not inform church officials that he used funds that he received from Hannah to make the Sloan Trust's February 2003 distribution.

¶ 48      In August 2003, the Sloan Trust again had insufficient liquid assets to make its monthly distribution. Hannah wrote a $10,000 check to respondent, who deposited it in his client trust account. Respondent then drew a check on his client trust account payable to the Sloan Trust in the amount of $9,066.67, and deposited the check into the Sloan Trust account. Respondent then sent St. Mark's its monthly check drawn on the Sloan Trust account. Respondent did not inform church officials that he used Hannah's personal funds to make the Sloan Trust's August 2003 distribution.

¶ 49      The complaint alleged that respondent intended to mislead school and church officials as to the source of the funds for the three above-cited distributions. In his answer, respondent admitted the facts of the occurrences, but denied that he intended to mislead anyone. At the hearing, respondent testified: "I thought that the interruption in cash flow was temporary, and there's $20,000 of my money that went to the church. Yes. I admit that." He further testified that he did not intend to deceive or mislead St. Mark's in his communications with church leaders.

¶ 50      The Hearing Board found that in each of these three occurrences respondent "purposefully engaged in dishonesty and deceit." The Board concluded that by not informing St. Mark's of the source of the funds used to make these three distributions, respondent made it falsely appear that the distributions came from trust income. According to the Board: "There was simply no reason for the Respondent [to] take the steps he did, if not to hide the source of the funds from St. Mark's." Further, according to the Board, respondent made it falsely appear by this deception that the Sloan Trust was doing well financially when, in fact, it lacked sufficient liquid assets to make those monthly distributions.

- 10 -

¶ 51    The Review Board majority recited the three occurrences of alleged dishonesty with the observation: "Respondent did not disclose the lack of liquid assets to St. Mark's but he was not required to make such a disclosure under the terms of the trust agreement." The Review Board further observed that "not all omissions of information amount to dishonest conduct in violation of Rule 8.4(a)(4)." According to the Review Board: "the only direct evidence of Respondent's intent was Respondent's own testimony. Respondent testified he did not intend to deceive St. Mark's but was only attempting to help the school by continuing to make payments to them. The Administrator offered no evidence to contradict Respondent's testimony." The Review Board concluded that "[i]n the absence of countervailing evidence, the Hearing Board was not entitled to simply disbelieve the only competent evidence adduced with regard to Respondent's intent." Accordingly, the Review Board found that the Hearing Board's findings of misconduct as to count II were against the manifest weight of the evidence.

¶ 52    One Review Board member dissented on this issue. She would have upheld the Hearing Board's finding that respondent engaged in dishonesty and deceit regarding count II. She recommended a 90-day suspension.

¶ 53    Before this court, the Administrator relies on the Hearing Board's findings that respondent engaged in dishonesty and deceit in violation of Rule 8.4(a)(4). We agree with the reasoning and conclusion of the Hearing Board. Rule 8.4(a)(4) is broadly construed to include anything calculated to deceive, including the suppression of truth and the suggestion of falsity. *In re Yamaguchi*, 118 Ill. 2d 417, 426 (1987). This type of conduct has been proved in this case.

¶ 54    The Review Board observed that the trust agreement did not require respondent to disclose the lack of liquid assets in the trust. However, a mere lack of disclosure is not at issue here. Respondent's misconduct goes to the suppression of truth and the suggestion of falsity. See *Yamaguchi*, 118 Ill. 2d at 426. The Review Board concluded that respondent's exculpatory testimony "was the only direct evidence" of his intent. "However, motive and intent are rarely proved by direct evidence, but rather must be inferred from conduct and the surrounding circumstances." *In re Stern*, 124 Ill. 2d 310, 315 (1988).

¶ 55    In the instant case, there is abundant circumstantial evidence that respondent calculated to deceive St. Mark's, and that he took steps to suppress truth or suggest falsity. Respondent conceded that he did not simply forward his or Hannah's funds directly to St. Mark's, although he certainly could have done so. Rather, he deliberately engaged in the above-described convoluted process to ultimately make the monthly distribution from the trust. His actions speak for themselves. As the Hearing Board found, there was no reason for respondent to take the actions he did unless he was attempting to conceal from St. Mark's and its representatives the true source of the funds. In assessing an attorney's conduct, "we need not remain blind or insensitive to the reasonable and clear cut intendments arising from respondent's own admissions and business records." *In re Krasner*, 32 Ill. 2d 121, 127 (1965). Disagreeing with the Review Board, we hold that respondent is subject to discipline for dishonesty to St. Mark's representatives in violation of Rule 8.4(a)(4), as alleged in count II.

¶ 56    Count III of the complaint alleged that in August 2005, respondent knew that: Range had breached the Production Sharing Agreement; Range was sued; and that judgment was entered

against Range for C$14,233,259. However, the August 2005 Report stated that "the health of the trust is good and the value of the trust has not significantly changed." Count III alleged that the August 2005 Report constituted dishonesty and deceit in violation of Rule 8.4(a)(4).

¶ 57    At the hearing, respondent testified that he asked Hannah for information to provide to St. Mark's. Hannah testified that he prepared the August 2005 Report. Respondent testified that he received the report from Hannah and forwarded it to St. Mark's.

¶ 58    The Hearing Board found that respondent engaged in dishonesty and deceit by: (1) leading St. Mark's officials to believe that the contents of the report were true to the best of his knowledge, when respondent actually had no idea of the truth or falsity of the report's contents; and (2) failing to inform church officials that he did not prepare the report. The Hearing Board also found that respondent "knew that some of the information in the report was false or, at least, highly misleading." After reciting the history of the trust up to August 2005, the Hearing Board concluded that respondent knew that the report's description of the trust's health as "good" and the trust's value as "not significantly changed" were misrepresentations.

¶ 59    The Review Board rejected the Hearing Board's findings that respondent engaged in dishonesty, concluding that they were against the manifest weight of the evidence. Referring to respondent's testimony that he relied on Hannah, the Review Board reasoned that it would create an unreasonable burden for trustees to suggest that a trustee cannot rely on information from a financial advisor in making statements to beneficiaries. The Review Board further found: "Nor do we believe that Respondent's failure to disclose Lance Hannah as the source of the information contained in the letter was intended to deceive anyone."

¶ 60    Before this court, the Administrator relies on the Hearing Board's conclusion that respondent engaged in dishonesty and deceit as charged. However, we agree with the Review Board that the Hearing Board's ultimate finding was against the manifest weight of the evidence. Respondent's reliance on: (1) Hannah, his financial advisor, to prepare the report; and (2) the information contained therein, was not dishonest or deceitful. Respondent's delivery of the report to St. Mark's was not dishonest; he never claimed that he prepared the report. There was no evidence that respondent knew that authorship of the report was an issue for church officials. In any event, he was under no duty to provide any information to St. Mark's.

¶ 61    Further, the Review Board correctly concluded that the Administrator failed to offer any evidence regarding respondent's knowledge of the truth or falsity of the contents of the August 2005 Report. The Review Board correctly found that no evidence was presented at the hearing that indicated what the value of the trust was in 2005, when the report was prepared, or in 2006 and 2008, when respondent again gave the report to church officials. The Administrator offered no evidence to prove that the value of the trust was anything other than the stated $3 million. The Review Board correctly concluded that the Administrator failed to meet his burden of proof on this issue.

¶ 62    This court has observed that "[t]here is essentially no way to define every act or form of conduct that would be considered a violation of Rule 8.4(a)(4). Each case is unique and the circumstances surrounding the respondent's conduct must be taken into consideration." *Cutright*, 233 Ill. 2d at 490. Based on the unique circumstances of this case, we decline to reverse the conclusion of the Review Board, and conclude that respondent did not violate

Rule 8.4(a)(4) as alleged in count III.

¶ 63                              3. *Dishonesty: 2000 Fund Investor*

¶ 64        In early 2001, Hannah visited Shirley Boers and asked her to invest in Range, and told her that she would earn 10% annual interest on her investment. They agreed that Boers would invest $100,000 in the 2000 Fund, and that Boers would receive her interest in monthly installments. Shortly thereafter, Hannah discussed the meeting with respondent.

¶ 65        On March 1, 2001, at Hannah's direction, Boers mailed respondent a check in the amount of $100,000 made payable to respondent's client trust account. Respondent sent Boers a letter acknowledging that her check constituted her investment in the 2000 Fund's Production Sharing Agreement with Range. Respondent deposited the check into his client trust account, and then transferred Boers's $100,000 to Range.

¶ 66        On April 18, 2001, respondent sent a letter to Boers, copied to Hannah, explaining that her monthly interest payments should be approximately $833.33. Enclosed with the letter was a check drawn on respondent's client trust account in the amount of $833.33. From May 2001, to August 2003, respondent signed and sent 21 form cover letters on his office stationery with each check. Each letter stated: "Enclosed is the interest payment for [month, year], in the amount of $833.33. If you have any questions, please feel free to contact this office."[6]

¶ 67        Count VI alleged that respondent's statements concerning "interest" to Boers were false. The complaint alleged that neither Range nor any other source paid interest on Boers's 2000 Fund investment. The complaint further alleged: "Respondent knew that his representations to Boers were false because he knew Range Energy had paid no interest or dividends and the letters and the 'interest' checks were intended to mislead her."

¶ 68        In his testimony, Hannah acknowledged that the monthly cover letters stated that her "interest" was enclosed. However, he recognized that each payment was not "interest *per se*, but it was her interest." Respondent testified that the cover letters contained what Hannah told him to write. Respondent was asked if he knew that the monthly checks to Boers "weren't actually interest payments." Respondent answered: "I didn't know what they were. They were given to me, and Lance [Hannah] asked me to send them to her. That's what I did."

¶ 69        The Hearing Board found that respondent violated Rule 8.4(a)(4) (Ill. R. Prof. Conduct R. 8.4(a)(4) (eff. July 6, 2001)), by engaging in dishonesty as charged. The Hearing Board found that respondent made false representations in the cover letters that he signed and sent to Boers. The Hearing Board reasoned that when respondent sent the letters, he knew that he did not know if the statements in the letters were true or false; however, respondent made no effort to ascertain if the payments were "interest" payments. The Hearing Board concluded that respondent "deliberately and knowingly signed and sent to Boers letters containing

---

[6]Boers's August 2003 check was her last check. That cover letter stated: "Lance has asked that I send this to you and to advise you that we are in the process of setting up a Corporation. Once this has been established, payments should be smoother and easier each month." Boers received no further payments or correspondence from respondent.

factual assertions about which he chose to remain ignorant" and, thus, acted to deceive Boers.

¶ 70     The Review Board reversed these findings. The Review Board observed that it was the Administrator's burden to prove by clear and convincing evidence that respondent's statement regarding "interest" in his cover letters were false. The Board concluded that "the Administrator failed to prove that the payments to Boers were something other than interest on her investments. Accordingly, we find that the Administrator failed to prove misconduct as to Count VI."

¶ 71     Before this court, the Administrator assigns error to this conclusion. The Administrator contends that he proved that Range had paid no interest to St. Mark's or the 2000 Fund during the time that respondent was sending checks to Boers. We disagree.

¶ 72     The Administrator presented no evidence whatsoever showing the exact nature of the monthly checks sent to Boers. Based on the record before us, there is no way to determine that they were not interest payments, and that respondent's cover letters characterizing them as "interest" payments were false.

¶ 73     Also, there is no evidence that respondent intended to deceive. To the contrary, the evidence establishes that respondent provided what he believed to be truthful information to Boers. The first letter, dated April 18, 2001, set forth respondent's understanding of the arrangement between Boers and Hannah, including that she would receive "interest" on her investment. Respondent had no independent knowledge of whether the monthly payments to Boers were or were not actually interest. Hannah sent to respondent the funds remitted to Boers, and the cover letters to Boers stated exactly what Hannah told respondent to write to her. The subsequent cover letters merely followed a form repeating the message that respondent received from Hannah: the checks represented "interest." There is no clear and convincing evidence that respondent made a statement that he knew was false.

¶ 74     It was the Administrator's burden to prove by clear and convincing evidence that respondent's statements in his cover letters to Boers were false. However, the Administrator presented no evidence whatsoever to establish what was the nature of the payments. After carefully reviewing the record, we hold that the Hearing Board's finding of dishonesty in violation of Rule 8.4(a)(4) was against the manifest weight of the evidence. We conclude that respondent did not violate Rule 8.4(a)(4) as alleged in count VI.

¶ 75                                 B. Respondent

¶ 76     Respondent assigns error to the Review Board's conclusions that he committed attorney misconduct by: (1) neglecting Sloan's estate as alleged in count V, and (2) commingling funds in his client trust account as alleged in count VII.[7]

¶ 77                         1. *Neglect of Sloan's Estate*

¶ 78     Sloan died on February 5, 2000. On February 8, 2000, respondent filed in the circuit court of Peoria County a petition to probate Sloan's will and for issuance of letters

_____

[7]"Either party may assert error in any ruling, action, conclusion or recommendation of the Review Board without regard to whether the party filed exceptions." Ill. S. Ct. R. 753(e)(5)(a) (eff. Sept. 1, 2006).

- 14 -

testamentary. On the same date, the circuit court admitted the will to probate and issued letters of office to respondent. A certified copy of the court file indicated that respondent never filed any accounting of his administration of the estate, or took any action in the probate case since February 2000.

¶ 79    In October 2001, the Internal Revenue Service notified respondent that the Sloan Trust owed a disputed amount of federal estate taxes. In November 2001, respondent remitted a $10,000 check and in May 2002 a $1,000 check, each drawn on the Sloan Trust account. As of September 2009, the IRS claimed an unpaid tax balance of $65,717 plus $35,048 in accrued interest, for a federal tax liability of the Sloan estate totalling $100,765. During the proceedings, respondent acknowledged that he "couldn't pay the IRS back because [he] had disbursed all the money." In 2011, respondent began negotiations with the IRS to obtain a reduction of the tax lien against the Sloan estate. The Administrator alleged, respondent admitted, and the Hearing Board found, that at the time of the hearing Sloan's estate remained open.[8]

¶ 80    The Hearing Board found that respondent's general neglect of the Sloan estate from 2000 to 2011 was an unreasonable and unjustified delay. The Board specifically found that respondent's failure to take any steps during the nine-year period from 2002 to 2011 to resolve the estate's tax liability, so that the estate could be closed, constituted an unreasonable and unjustified delay. The Board found that "respondent's lack of diligence has resulted in an increase of tax liability, including interest, for the Sloan estate." The Board found that the Administrator proved by clear and convincing evidence that respondent, *inter alia*, failed to act with reasonable diligence and promptness in representing a client in violation of Rule 1.3 (Ill. R. Prof. Conduct R. 1.3 (eff. Aug. 1, 1990)), and engaged in conduct that is prejudicial to the administration of justice in violation of Rule 8.4(a)(5) (Ill. R. Prof. Conduct R. 8.4(a)(5) (eff. July 6, 2001)).

¶ 81    The Review Board upheld these findings. Respondent argued that he did not violate Rule 1.3 because he was acting as an executor, and he was not acting as a lawyer representing a client. The Review Board rejected this argument, concluding that respondent neglected the estate both as an executor and as the attorney for the estate. Because a judicial proceeding was involved, the Review Board also upheld the Hearing Board's findings as to respondent's violation of Rule 8.4(a)(5). See *In re Smith*, 168 Ill. 2d 269, 285-88 (1995) (Rule 1.3 violation can be prejudicial to administration of justice in violation of Rule 8.4(a)(5)).

¶ 82    Before this court, respondent contends that the complaint alleged only that he neglected Sloan's estate in the capacity of executor. Respondent argues that there was no allegation that he neglected the estate as the attorney for the estate.

¶ 83    We reject this argument. Respondent overlooks his admissions in his answer to the Administrator's complaint. Respondent admitted that he acted in his capacity of attorney in drafting Sloan's will and the trust agreement, and opening the probate estate in the circuit court. Further, as the Review Board observed, respondent charged fees to work on the estate matter, and deposited those fees into his law office account because he considered them to be

---

[8]He further acknowledged that Sloan's estate was "still open *** because the estate doesn't have the money to pay that tax."

- 15 -

legal fees. We agree with the Review Board that respondent's roles as attorney and executor were intertwined. We hold that respondent is subject to discipline for his neglect of Sloan's estate in violation of Rules 1.3 and 8.4(a)(5).

¶ 84                                    2. *Commingling*

¶ 85        Between February 2000 and June 2009, respondent paid personal and business expenses from his client trust account. In his answer, respondent admitted to the several payments alleged in the complaint. The Hearing Board found that the Administrator proved by clear and convincing evidence that respondent failed to hold client or third-party funds separate from his own property in violation of Rule 1.15(a) (Ill. R. Prof. Conduct R. 1.15(a) (eff. Dec. 1, 1998)). The Review Board upheld the Hearing Board's findings.

¶ 86        Before this court, respondent argues, as he did below, that he should not be disciplined because he did not pay his personal bills with "client" funds. Rather, he had left earned fees in the client trust account for a period of weeks, and then paid his personal bills with his earned fees. Respondent reasons: "No client was harmed or could have been harmed, as all funds belonging to clients were always in the trust account." According to respondent, "[t]his isolated conduct is arguably not worthy of any formal disciplinary action" and, therefore, count VII should be dismissed.

¶ 87        This argument lacks merit. It is "absolutely impermissible" for an attorney to commingle his or her funds with those of a client. *In re Clayter*, 78 Ill. 2d 276, 278-79 (1980). It is a paramount obligation of each member of the bar to study the applicable professional conduct rules and abide by their terms and principles. *In re Cheronis*, 114 Ill. 2d 527, 535 (1986). This court has consistently condemned commingling. *Clayter*, 78 Ill. 2d at 281. We hold that respondent is subject to discipline for failing to hold client property separate from his own property in violation of Rule 1.15(a).

¶ 88                                    C. Sanction

¶ 89        The Hearing Board recommended that respondent be suspended from the practice of law for one year. The Review Board recommended a 60-day suspension. Challenging the Review Board's recommendation, the Administrator contends that respondent's misconduct warrants a suspension for at least one year. Respondent contends that the appropriate sanction is reprimand or censure.[9]

¶ 90        This court is not bound by the disciplinary recommendations of either the Hearing Board or the Review Board because those recommendations are only advisory, and the ultimate responsibility for imposing discipline on attorneys rests with this court. The purpose of attorney discipline is not punishment, but rather to protect the public, maintain the integrity of the legal profession, and protect the administration of justice from reproach. *Cutright*, 233 Ill. 2d at 490-91; *Winthrop*, 219 Ill. 2d at 559. We acknowledge the goals of consistency and predictability in the imposition of sanctions. However, we recognize that each case is unique and must be decided on its own facts. *In re Mulroe*, 2011 IL 111378, ¶ 25; *Winthrop*, 219 Ill. 2d at 559. In determining the appropriate sanction, we consider the nature of respondent's

_____

[9]See Ill. S. Ct. R. 770 (eff. Apr. 1, 2004) (nonexclusive list of types of discipline).

- 16 -

misconduct and any aggravating or mitigating circumstances. *In re Gorecki*, 208 Ill. 2d 350, 360-61 (2003).

¶ 91 Regarding the neglect of Sloan's estate, this court has repeatedly observed that neglect in the performance of an attorney's duties to a client can be sufficient to warrant discipline. Where a corrupt motive and moral turpitude are not clearly shown, suspension is a proper punishment. *In re Levin*, 77 Ill. 2d 205, 210 (1979); *In re Chapman*, 69 Ill. 2d 494, 501 (1978). Regarding the finding of commingling, we recognize that respondent maintained a client trust account. However, he used the account as he would any other business account, commingling his personal funds with client funds. This practice violated respondent's professional duty to maintain client funds in a separate account. This court has repeatedly stated that commingling will not be countenanced. *Mulroe*, 2011 IL 111378, ¶ 26 (quoting *Cheronis*, 114 Ill. 2d at 535). Commingling is a ground for suspension (*Cheronis*, 114 Ill. 2d at 535), as is misrepresentation (*In re Merriwether*, 138 Ill. 2d 191 (1990)).

¶ 92 Respondent relies on the Review Board's findings that his only misconduct was neglecting a probate estate and commingling. Respondent cites to disciplinary cases involving neglect or commingling where this court has imposed censure. See, *e.g.*, *In re Young*, 111 Ill. 2d 98 (1986) (commingling); *In re Kink*, 92 Ill. 2d 293 (1982) (neglect); *In re Clayter*, 78 Ill. 2d 276 (1980) (commingling); *In re Sherman*, 60 Ill. 2d 590 (1975) (same); *In re Ahern*, 23 Ill. 2d 69 (1961) (neglect). Rejecting this suggestion, we agree with the Review Board's observation: "Respondent's total lack of diligence in handling the Sloan estate resulted in the estate incurring interest liability on the overdue taxes owed. Respondent took no action to resolve the tax liability issues. He offered no justification or reasonable explanation for his neglect." Also, even absent a dishonest motive, commingling presents a substantial risk of harm to the client. See *Cheronis*, 114 Ill. 2d at 536. Additionally, we agree with the Hearing Board that respondent's misrepresentations to church representatives violated Rule 8.4(a)(4). Therefore, respondent's conduct warrants a period of suspension.

¶ 93 We next address the length of the suspension. In aggravation, the Administrator recounts the Hearing Board's findings of misconduct as charged in all seven counts of the complaint. The Hearing Board recommended a one-year suspension, which the Administrator argues should be the minimum sanction. However, as the Review Board observed, the Hearing Board recommended a one-year suspension based on its findings against respondent in all seven counts of the complaint. We are now imposing discipline for respondent's violations of only three counts. Therefore, we initially agree with the Review Board that a one-year suspension, which the Hearing Board recommended, is not warranted.

¶ 94 We observe that this court has imposed three-month suspensions in cases involving neglect (*In re Harth*, 125 Ill. 2d 281 (1988); *Levin*, 77 Ill. 2d 205; *Chapman*, 69 Ill. 2d 494), commingling (*Mulroe*, 2011 IL 111378; *Cheronis*, 114 Ill. 2d 527), and misrepresentation (*Merriwether*, 138 Ill. 2d 191). Of course, there are cases where the suspensions have been longer and other cases where the suspensions have been shorter. Using these sanctions in previous cases as a guide, we nonetheless base our determination on the unique circumstances surrounding this case.

¶ 95 Respondent has been licensed since 1975, and has never before been disciplined. He was cooperative during the disciplinary proceedings. The testimony of multiple character witnesses indicates that respondent has a good reputation for honesty and integrity in the

Peoria area. He has been active in the Peoria community and at St. Mark's parish. He has taken an ARDC professionalism seminar and has revised his office procedures pertaining to his client trust account.

¶ 96    Having considered the serious nature of the offenses, the circumstances of this case, as well as our previous decisions, we conclude that a three-month suspension is the appropriate sanction in this case.

¶ 97                                III. CONCLUSION

¶ 98    For the foregoing reasons, respondent is suspended from the practice of law for three months.

¶ 99    Respondent suspended.