Docket No. 87237–Agenda 32–May 1999.

In re
 LINDA LEE SPAK, Attorney, Respondent.

Opinion filed September 30, 1999.

JUSTICE HEIPLE delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a complaint with the Hearing Board charging respondent, Linda Lee Spak, with conversion, failure to reduce a contingent fee agreement to writing in violation of Rule 1.5(c) of the Illinois Rules of Professional Conduct, failure to notify a third person upon receiving funds in which the third person has an interest in violation of Rule 1.15(b), knowingly making a false statement of material fact or law to a third person in the course of representing a client in violation of Rule 4.1(a), conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of Rule 8.4(a)(4), and conduct prejudicial to the administration of justice in violation of Rule 8.4(a)(5). The charges arose out of respondent’s activity in collecting a debt on behalf of Rosario T. Miranda. Respondent denied that she committed misconduct and disputed many of the facts alleged in the complaint.

Following a hearing, the Hearing Board found that respondent had engaged in conversion and had failed to reduce a contingent fee agreement to writing. The Hearing Board concluded that the Administrator failed to prove by clear and convincing evidence that respondent engaged in the other misconduct charged. The Hearing Board recommended that respondent be censured. The Review Board approved the findings and recommendation of the Hearing Board, except that it found that respondent’s actions in regard to the contingent fee arrangement did not constitute misconduct under Rule 1.5(c). We granted the Administrator’s petition for leave to file exceptions. For the reasons that follow, we approve in part and reject in part the findings of the Review Board, approve the findings of the Hearing Board, and approve the recommendations of the Hearing Board and Review Board.

BACKGROUND

I. The Evidence

Respondent was licensed to practice law in 1982. Respondent was a sole practitioner, with a general civil practice. Approximately 20% of her practice involved collection work.

Rosario T. Miranda was formerly married to Dr. Regalado S. Florendo. They were divorced in 1985. Under the judgment for dissolution of marriage entered December 31, 1985, Florendo was made the owner of the parties’ 19% interest in the 32 West Randolph Street Limited Partnership (hereinafter, the limited partnership). The judgment directed that, within 60 days after its entry, Florendo was to establish a trust and transfer into it his ownership in the limited partnership. The judgment specified that Florendo was to be the trustee of the trust and that he and Miranda were to be equal beneficiaries. The judgment also provided that, upon any sale of the parties’ interest in the limited partnership, Florendo and Miranda would each receive one-half of the net sale proceeds.

Florendo did establish a trust, but this trust was not established until May 19, 1989 (hereinafter, the May 1989 trust). As such, it was not the trust described in the judgment for dissolution of marriage. Under the May 1989 trust, Florendo was the trustee; his sister, Clarita F. Navarro, was designated the successor trustee. Florendo transferred various property into this trust, including all of his interest in the limited partnership. Florendo died shortly thereafter and Navarro succeeded him as sole trustee of the May 1989 trust.

On October 6, 1989, Navarro signed an assignment agreement as trustee of the May 1989 trust. This document indicated that Navarro owned a 19% interest in the limited partnership. Navarro assigned that interest to Morris Kalish, the general partner, for a purchase price of $332,500. While the assignment agreement did not refer to Miranda, she consented to the transaction. Florendo’s corporation, Urban Health Services, Inc. (Urban), which Navarro owned after Florendo’s death, was indebted to Kalish for $50,000 plus interest. The assignment agreement indicated that this debt would be repaid by giving Kalish a credit against the purchase price. The assignment agreement also established a schedule of payments; the final payment of $46,500 was due on February 28, 1990.

The final installment under the assignment agreement was not paid when due and remained outstanding as of August 1991. At that time, Miranda retained respondent to represent her in attempting to collect this debt. When she retained respondent, Miranda told her that she was entitled to receive money under a divorce decree. Miranda also told respondent that she was the trustee of a trust; however, Miranda did not give respondent supporting documentation. Miranda did give respondent copies of the judgment for dissolution of marriage and of the assignment to Kalish.

Before the Hearing Board, respondent testified that she believed Miranda’s statement that Miranda was the trustee. According to respondent, she assumed that Miranda was the successor trustee of the trust which was to have been established under the judgment for dissolution of marriage. Respondent testified that she made this assumption for several reasons. First, the judgment directed that a trust be created by March 1, 1986; respondent assumed that this had actually been done. Under the terms of the judgment, this trust was supposed to contain the limited partnership interest. Miranda and Florendo were the only persons named in connection with that trust, and they were to be the trust’s sole and equal beneficiaries. Respondent knew that Florendo was now deceased. In addition, the judgment provided for another trust, which was to contain $1.5 million for the benefit of Miranda and the couple’s minor children. Miranda and Navarro were cotrustees of this trust. Finally, respondent considered a letter from Carl Gorski, attorney for the May 1989 trust, which had been sent to Miranda on July 19, 1989. This letter confirmed that Miranda was entitled to one-half the proceeds of the sale of the property. The letter also referred to Florendo’s will and indicated that each of Florendo’s minor children was an equal residuary beneficiary of his trust.

Given the disparity in time between the judgment for dissolution of marriage and the creation of the May 1989 trust, respondent concluded that the trust described in the judgment was a different trust from the May 1989 trust. Respondent knew that Navarro was trustee of the May 1989 trust. Respondent testified that she had not seen any documents which confirmed her assumption that Miranda was the trustee of a trust which held title to the limited partnership. It appears that the trust described in the judgment was never, in fact, established.

As of August 1991, respondent still had not seen a copy of the May 1989 trust agreement. Respondent testified that she repeatedly attempted to obtain a copy of this document, both from Miranda and from Gorski, but it was not provided to her until after the debt was settled. She testified that she periodically requested that Gorski send her copies of other trust documents but she never received them.

On August 23, 1991, respondent wrote a letter to Kalish. Respondent had not asked Gorski, Navarro, or anyone other than Miranda for permission to attempt to collect the debt directly from Kalish. In her letter, respondent indicated that she had been retained to represent Miranda in collecting the delinquent balance due to the Florendo trust under the assignment agreement. Respondent indicated that the amount due was $46,500, plus interest, and demanded payment. She sent copies of this letter to Navarro and Gorski because the assignment agreement directed that they be notified of any action taken regarding the assignment, and because respondent wanted to put them on notice of her efforts to collect the unpaid amount.

Kalish did not respond to respondent’s letter. On May 7, 1992, respondent again wrote Kalish and stated that she had been retained to represent Miranda in collecting the delinquent balance due to the Florendo trust. Respondent demanded payment of $59,996.20 (the delinquent principal plus interest). Copies of this letter were also sent to Navarro and Gorski. After receiving this letter, Kalish telephoned respondent, but the matter was not resolved at that time.

On June 2, 1992, respondent again wrote to Kalish. This letter indicated that Miranda’s 19% interest in the 32 West Randolph Building would be sold unless all sums due to Miranda were paid in full prior to the date set for sale. According to the letter, the interest in the building was pledged to Miranda pursuant to the assignment agreement. The accompanying notice of sale of collateral described Miranda as the creditor and as the legal owner of 19% of the 32 West Randolph property. Respondent testified that copies of these documents were sent to, among others, Gorski and Navarro. The letter itself indicates only that a copy was sent to Navarro.

Neither Gorski nor Navarro (nor anyone else) ever requested that respondent discontinue her attempts to collect the debt directly from Kalish, nor did anyone indicate that respondent lacked the authority to proceed. Likewise, no one contacted respondent to assert any claim of the May 1989 trust to any money due from Kalish. Consequently, respondent assumed that Gorski and Navarro did not object to her collection efforts.

Eventually, Kalish responded to the June 2 letter and negotiated a settlement with respondent. On behalf of Miranda, and without notifying Gorski or Navarro, respondent agreed to accept $38,000 in settlement of the claim. In payment of the settlement, Kalish sent respondent a check for $38,000 payable to the Regalado S. Florendo Trust and Linda Spak. Prior checks had been made payable to “Regalado S. Florendo Trust, dated May 19, 1989” and had been sent to Navarro. Respondent’s name was included as a payee on the settlement check to expedite negotiation of that check. Respondent did not discuss with Kalish how to designate the other payee.

After receiving the check, respondent contacted Miranda. In a June 16, 1992, letter, Miranda authorized respondent to execute the settlement check in Miranda’s name as trustee. Respondent endorsed the check “Regalado S. Florendo Trust by Rosario T. Miranda, Trustee” and deposited it into her client trust account. Respondent did not contact Gorski or Navarro at that time to determine any interest of the May 1989 trust, nor did she obtain their authority to endorse the check. However, respondent testified that she did notify Gorski and Navarro upon her receipt of the check.

When respondent distributed the settlement proceeds received from Kalish, she knew that Miranda was only entitled to half the proceeds from the sale of the interest in the limited partnership. However, respondent testified that, according to her calculations, due to set-offs for Urban’s debts, she believed Miranda was entitled to all the money that was received from Kalish. She believed that the May 1989 trust was owed nothing.

At the time respondent agreed to represent Miranda, she did not enter into a written fee agreement. Respondent testified that they agreed on the fee terms and that Miranda had understood those terms. Respondent indicated that the fee was to be a $500 retainer, with a contingent fee of one-third of any recovery. The retainer was to be credited against any contingent fee. Miranda’s June 1992 letter to respondent confirmed Miranda’s understanding of these fee terms and directed respondent to remit the balance to Miranda. After depositing Kalish’s check, respondent took fees consistent with the terms of Miranda’s letter, and sent Miranda a certified check for the balance of $25,833.33.

On August 11, 1992, Gorski wrote to respondent. In this letter, Gorski acknowledged that, as of June 15, 1992, Miranda was entitled to $30,756.52, but asserted that as of August 15, 1992, the trust was owed $8,863.02. He demanded payment of that amount on behalf of the trust. Gorski asserted that Kalish’s final payment should have been, but was not, made to the May 1989 trust.

Respondent testified that she was shocked and confused by Gorski’s claim that the trust was entitled to funds. Respondent testified that if such a claim had been asserted previously, she would not have proceeded with collection efforts or distributed the money as she did.

Gorski sent respondent a second letter, on August 19, 1992, again demanding payment of $8,863.02 plus interest to the trust. With this letter, Gorski sent respondent copies of the May 1989 trust agreement. Respondent had not seen this document before settling with Kalish.

In September 1992, respondent wrote to Miranda and sent her an accounting of the payments made in connection with the assignment. Respondent advised Miranda that Kalish’s final payment had resulted in an excess paid to Miranda, and a deficit due the trust, of $8,862. Respondent proposed that Miranda offer the trust that amount, less a proportionate share of attorney fees. Miranda did not respond. Thereafter, respondent was unable to reach Miranda, and had heard that Miranda was out of the country.

The trust retained counsel, who wrote to respondent in December 1993, threatening to sue if the matter were not resolved. On June 1, 1994, Navarro filed a civil lawsuit against respondent. On February 17, 1995, the court entered summary judgment in favor of the trust and against respondent for $38,000 plus post-judgment interest. This was based on respondent’s endorsement of the check and the court’s view that she had converted the full settlement proceeds.

In April 1995, respondent and the trust entered into a settlement agreement under which respondent was to pay the trustee $24,000 in three installments. Respondent made the first payment, of $14,000, but was unable to pay the subsequent installments. Respondent did not contact opposing counsel to attempt to make alternative arrangements. After a citation to discover assets was filed, respondent negotiated new settlement terms, such that she would pay an additional $15,000. She ultimately paid this amount in three installments, completing payment in February 1997. All told, respondent paid the trust a total of $29,000 out of her own funds. Miranda did not send respondent any money towards these payments.

In her testimony before the Hearing Board, respondent acknowledged that she had made a mistake. In retrospect, she realized that she should not have endorsed the check without having a better understanding of her authority to do so. Respondent recognized, in hindsight, that she had not had authority to negotiate the check; however, at the time she negotiated it, she thought she did have such authority.

Navarro also testified before the Hearing Board. She indicated that she did not recall receiving any letters from respondent, nor had she spoken to respondent. Navarro did not recall speaking to Gorski about respondent’s collection efforts, and did not know prior to June 15, 1992, that respondent received a settlement. According to Navarro, the trust paid approximately $23,000 in legal fees attempting to collect its portion of the settlement.

The parties stipulated that, if called as a witness, Gorski would have testified as follows. He received copies of respondent’s August 23, 1991, and May 7, 1992, letters to Kalish. Neither he nor Navarro authorized respondent to make collection efforts on behalf of the trust. Gorski became aware in August 1992 that respondent had agreed with Kalish to accept $38,000 in settlement of all outstanding amounts owed to the trust. He later learned that respondent had negotiated the settlement check and distributed the proceeds to herself and Miranda. Gorski would have testified that he did not speak with respondent before this, and that he and Navarro were not informed that respondent was involved in settlement negotiations with Kalish, were not asked to approve the offer of $38,000, and did not authorize respondent to settle the trust’s claim against Kalish.

John Bubula, the accountant for the May 1989 trust, testified that Kalish made his prior payments to the trust. Consistent with her rights under the divorce decree, Miranda received one-half of the proceeds as the trust received them. All concerned relied upon the judgment as the basis for Miranda’s interest in the property. There were no other documents memorializing her interest. Bubula indicated that, because of the offset for Urban’s debts, the trust retained less than 50% of the installment payments due from Kalish. According to Bubula’s calculations, the trust was entitled to $8,694.78 of the final payment from Kalish. While he had never spoken with respondent, Bubula knew, through Gorski, that respondent was corresponding with Kalish. Bubula and Gorski had discussed the matter and respondent’s collection efforts. Bubula first learned of the settlement after Kalish made final payment.

Respondent also presented the testimony of character witness Eric Romer, who had known respondent for several years and shared office space with her. Romer described respondent as a very competent attorney, caring, well-qualified, and meticulous. Respondent had no prior discipline. Throughout her legal career, respondent had regularly performed 
pro bono
 work, handling three or four cases per year through Chicago Volunteer Legal Services.

II. The Hearing Board

In its report and recommendation, the Hearing Board found that respondent had engaged in conversion and had failed to reduce a contingent fee agreement to writing. The Hearing Board concluded that the Administrator failed to prove by clear and convincing evidence that respondent engaged in the other misconduct charged. The Board also indicated its view that the facts demonstrated a lack of vigilance rather than fraud. The Hearing Board expressly found no dishonest motive on respondent’s part. The Hearing Board regarded respondent’s demeanor and testimony as credible. The Board noted that respondent had expressed regret and regarded her as likely to be more careful in the future. The Board also considered respondent’s 
pro bono
 work, her lengthy period of practice without prior discipline, and the fact that she had returned the funds converted, albeit pursuant to court order. In its conclusion, the Hearing Board recommended that respondent be censured.

III. The Review Board

The Review Board agreed with the Hearing Board that respondent engaged in conversion, but held that respondent’s actions in regard to the contingent fee arrangement did not constitute misconduct under Rule 1.5(c). The Review Board reasoned that, while there was no written agreement on fees at the outset of the representation, respondent and Miranda did reach a complete understanding of how the fees were to be determined. This understanding was confirmed, in writing, by Miranda before respondent actually took any fees. The Review Board noted that it is not advisable to delay memorializing the terms of a contingent fee agreement in writing. Nevertheless, the Review Board found that under the specific circumstances of this case, the purposes underlying Rule 1.5(c) were adequately served and thus that misconduct should not be found.

The Review Board accepted the Hearing Board’s finding that respondent acted without dishonest intent, and did not profit from her actions. Rather, respondent acted at the direction of her client in a manner which she honestly, albeit erroneously, thought was legitimate. According to the evidence adduced at the hearing, respondent repeatedly gave notice of her actions to the trust’s attorney and to the trustee, and was never told that she was acting without authority. Moreover, although respondent periodically asked Gorski to furnish copies of the trust documents (which might have alerted respondent that her client was not the trustee), Gorski failed to send the documents.

Despite these mitigating factors, however, the Review Board found that respondent’s conduct demonstrated a serious lack of care. She assumed, without seeing supporting documentation, the truth of her client’s representations that she was the trustee of a trust which owned valuable property. Respondent made this assumption in the face of documents that suggested that someone else, 
i.e.
, Navarro, was the trustee. Respondent proceeded to act without obtaining further documentation to clarify the identity of the trustee. She then not only settled the claim, but also endorsed the settlement check despite the ambiguities presented. The Review Board found that respondent’s lack of care went beyond simple negligence. Although it turned out that respondent was the only person truly harmed by her error, respondent’s actions could easily have backfired to the detriment of her client and of third parties. Because of the serious nature of the carelessness which led to her conversion of the settlement proceeds, the Review Board found that respondent’s conduct warranted discipline, and recommended that respondent be censured.

IV. The Administrator’s Exceptions

The Administrator has filed exceptions to the Review Board’s finding with this court, and argues that: (1) the Hearing and Review Boards erred in finding that respondent did not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation in converting the trust funds; (2) the Review Board erred in reversing the Hearing Board’s finding that respondent violated Rule 1.5(c) by failing to reduce the contingent fee agreement to writing; and (3) respondent’s misconduct warrants a term of suspension.

ANALYSIS

The Administrator argues first that the Hearing and Review Boards erred in finding that respondent’s conduct did not manifest a fraudulent intent. On the contrary, contends the administrator, respondent’s actions in attempting to collect a debt owed to the trust, without first verifying that her client was actually the trustee of that trust, were so grossly reckless that they support a finding of fraudulent intent as a matter of law.

This court has noted that the Hearing Board’s findings regarding the credibility of witnesses, the resolution of conflicting testimony, and any other fact-finding judgments are entitled to great deference. 
In re Blank
, 145 Ill. 2d 534, 547 (1991).  This is due to the fact that the Hearing Board is able to observe the witnesses’ demeanor and judge their credibility. 
In re Hopper
, 85 Ill. 2d 318, 323 (1981). Thus, the Hearing Board’s factual determinations will generally not be disturbed unless they are against the manifest weight of the evidence. 
In re Rinella
, 175 Ill. 2d 504, 517 (1997).

In the instant case, we find no reason to disagree with the Hearing Board’s finding that respondent’s actions in collection of the debt did not involve a dishonest or fraudulent motive. Evidence was presented on both sides of this issue, and the Hearing Board, which was in a better position to judge such matters as credibility and intent, found that respondent did not act with a dishonest motive. Of particular note here, the Hearing Board heard testimony that respondent repeatedly advised both the actual trustee and the trust’s attorney of her collection efforts. Such conduct is inconsistent with an intent to defraud the trust.

The Administrator next argues that the Review Board erred in finding, 
sua sponte
, that respondent did not violate Rule 1.5(c) by failing to reduce the contingent fee agreement to writing. We agree.

The Review Board found that the purposes of Rule 1.5(c) are “sufficiently served” where “the client knew the fee terms from the outset and the client herself has fully confirmed the terms in writing before the attorney receives a fee.” Contrary to the Review Board’s finding, the writing requirement of Rule 1.5(c) is mandatory. That rule provides:

“A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated.” 134 Ill. 2d R 1.5(c).

The writing requirement of Rule 1.5(c) contains no exception. More importantly, the Review Board’s reading of the rule would permit an attorney to wait to reduce a contingent fee to writing until after the work is done and the attorney is in possession of the proceeds of litigation. A client in such a situation may be left with the unenviable choice of agreeing with his attorney’s recollection of the fee agreement, or delaying receipt of his money pending resolution of a fee dispute. The inequality of bargaining power between the attorney and client in such a case is readily apparent. We decline to adopt a rule so fraught with potential for abuse. We therefore hold that respondent is guilty of misconduct for failing to reduce a contingent fee to writing in violation of Rule 1.5(c).

Finally, the Administrator argues that respondent’s misconduct warrants a term of suspension and asks this court to enter an order suspending respondent from the practice of law for six months. In imposing discipline, our purpose is not to punish the attorney, but rather to “protect the public, to maintain the integrity of the profession and to protect the administration of justice from reproach.” 
In re Fox
, 122 Ill. 2d 402, 410 (1988).  Our goal is to impose sanctions consistent with sanctions imposed for similar misconduct so as to ensure predictability and fairness in future disciplinary cases. 
In re Hopper
, 85 Ill. 2d 318, 324 (1981). We note, however, that each case is unique and must be resolved with respect to its particular facts and circumstances. 
In re Ushijima
, 119 Ill. 2d 51, 57 (1987).

Both the Administrator and respondent have cited numerous cases in their respective arguments for either a six-month suspension or a censure. We find the cases of 
In re Young
, 111 Ill. 2d 98 (1986), 
In re Lenz
, 108 Ill. 2d 445 (1985), and 
In re Clayter
, 78 Ill. 2d 276 (1980), to be the most helpful in determining the proper sanction to be imposed in this case.

In 
Young
, an attorney commingled and converted funds which were to be used to clear a title defect on property involved in a real estate transaction. The commingling and conversion occurred during a period in which “there was a 
bona fid
e title problem with respect to his client’s property which justified his retention of the money.” 
In re Young
, 111 Ill. 2d 98, 104 (1986). This court held that, given the attorney’s lack of dishonest motive, as well as his lack of prior discipline and extensive 
pro bono
 work, censure was the appropriate discipline.

In 
Lenz
, an attorney commingled and converted client funds when the balance of his client trust account fell below the amount which he held on behalf of his clients after the attorney wrote a check against the trust account in order to purchase a wheelchair-lift-equipped van for another client. Describing this as an isolated act of misconduct in an otherwise distinguished career, this court ordered that the attorney be censured.

Finally, in 
Clayter
, an attorney commingled earnest money which he held for parties to a real estate transaction and converted the money to his personal use. Clayter deposited the money in a realty company’s bank account. Thereafter, the balance in that account fell below the amount of the funds in question on several occasions. The court concluded that censure was the appropriate sanction in light of a record which disclosed that the attorney had acted without dishonest motive; that the respondent had practiced law for almost 20 years with no other complaints of ethical infraction; and that he had an outstanding record of involvement in community service programs.

 After considering all of the circumstances of this case, we conclude that a censure, as recommended by both the Hearing Board and the Review Board, is the appropriate sanction in this case. We rely most heavily upon the Hearing Board’s finding that respondent did not act with any fraudulent intent. We have also considered the other mitigating factors noted by the Hearing Board.

For the foregoing reasons, we approve in part and reject in part the findings of the Review Board, approve the findings of the Hearing Board, and approve the recommendations of the Hearing Board and Review Board. Accordingly, it is ordered that respondent be censured.

Respondent censured.