2020 IL App (1st) 191155-U

THIRD DIVISION
December 23, 2020

No. 1-19-1155

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| JOHN P. DEROSE, CAITLYN F. DEROSE, and JOHN P. DEROSE & ASSOCIATES, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants | ) ) | Cook County |
| v. | ) ) | 17 L 13238 |
| FRANCO N. CARONE, CARONE LAW OFFICES, OLIVIA C. HUBEL-TAYLOR, and HUBEL & TAYLOR, | ) ) ) ) | Honorable Michael T. Mullen, Judge Presiding |
| Defendants-Appellees. | ) ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: Vacated and remanded with instructions. Trial court's determination that referring attorney was entitled to thirty percent of attorney-fee award was not against manifest weight of evidence and was legally correct. Division of fee between two law firms that tried case leading to judgment award was incorrect, as fee-sharing agreement violated supreme court rules and was unenforceable.

¶ 2    The parties in this case are the attorneys who represented the victim of police misconduct in a federal civil rights suit styled *Jose Lopez, by his wife and next best friend, Sandra Cardiel v. Unknown Chicago Police Officers and the City of Chicago, Illinois*, Case No. 12 CV 5751 (the

"*Lopez* suit"). The case was tried in a bifurcated trial. After a jury verdict finding liability, the *Lopez* suit settled for $9.5 million.

¶ 3    What happened next, the trial court put best: "What should have been celebrated by the attorneys as an outstanding settlement, especially given the challenging liability that was presented, unnecessarily devolved into: name calling; requests for sanctions; accusations of legal malpractice; and overall less than polite behavior by all the attorneys involved in this litigation."

¶ 4    The source of this conflict, and the subject of this case: How to split the $3.8 million in attorney fees that resulted from the settlement of the *Lopez* suit between three lawyers. In a summary evidentiary hearing to which all parties agreed, the trial court made findings of fact and conclusions of law and divided up the attorney fees accordingly. Plaintiffs here disagree with the court's judgment and appeal. We vacate the judgment and remand.

¶ 5                                    BACKGROUND

¶ 6    In 2011, Jose Lopez suffered extremely severe injuries after being tasered by an officer of the Chicago Police Department. As result of the injuries, Jose was bed-ridden and in a semi-comatose state. (He would later succumb to these injuries not long after the *Lopez* suit was settled.)

¶ 7    That's where the lawyers (and their law firms) who are parties to this lawsuit come in. The first is defendant Olivia Hubel (and her law firm), a criminal-defense attorney whom Jose's family contacted about a year after his injuries. She referred the potential civil-rights case against the city to a co-defendant in this suit, attorney Franco N. Carone and his law firm, who in turn engaged the plaintiffs here, John DeRose, Caitlyn DeRose, and their law firm, as co-counsel on the *Lopez* suit. For simplicity's sake, we will generally refer to each group of lawyers and law firms by their last names—DeRose, Carone, and Hubel—unless more specificity is required.

¶ 8       After everyone generally agreed to the joint representation of the Lopez family by co-counsel Carone and DeRose, with a referral fee to Hubel, the parties set out to memorialize the terms in writing. The parties' agreements are contained in three documents executed on the same day.

¶ 9       First, the "Acknowledgement of and Consent to Co-counsel Representation Attorney's Fee Arrangement" (the "Referral Contract"). The Referral Contract acknowledged that Carone and DeRose would serve as co-counsel on the *Lopez* suit, and that Hubel—as the referring attorney, and with the consent of the Lopez family—would be entitled to 30% of any attorney fees recovered in the case by Carone and DeRose. This document was signed by all three lawyers and the client.

¶ 10      Second, the "Contract with Contingency Fee" (the "Contingent-Fee Contract") provided that Carone and DeRose would be entitled to a contingent-fee recovery of 40% of any amount recovered in the *Lopez* suit, not including any attorney fees awarded as a result of being the prevailing party in a federal civil-rights action. This document was signed by the client, Carone, and DeRose, but the referring attorney, Hubel, was not a signatory.

¶ 11      The third document was the "Addendum to Contingent Fee Contract Where Statutory Attorney's Fees May Be Awarded" (the "Addendum"). This Addendum acknowledged that, should the plaintiffs prevail in the *Lopez* suit, attorneys Carone and DeRose might seek separate recovery for attorney fees under the applicable statute awarding such fees to the prevailing party in a civil-rights lawsuit. See 42 U.S.C. § 1988. This Addendum again made clear that any such fee award would be separate and distinct from any contingent-fee award recovered. Like the Contingent-Fee Contract, this document was signed by the client, Carone, and DeRose, but not Hubel.

¶ 12    Having executed the above documents, the attorneys immediately got to work on the *Lopez* suit. For nearly five years, things proceeded well enough. The case was set for a bifurcated trial, the issues of liability and damages tried separately. After a hard-fought liability trial, the jury reached a verdict in favor of Jose. While the damages phase was commencing, the *Lopez* suit settled for $9.5 million. Forty percent of that amount is $3.8 million.

¶ 13    Pursuant to local rules of the circuit court of Cook County, an estate was opened to administer and approve the settlement of Lopez, a disabled person. A petition was brought before the probate court to approve the 40% contingent-fee award to the attorneys. On November 1, 2017, the trial court granted the petition, after hearing from the attorney for the guardian and the guardian *ad litem*: "the contingency fee of forty percent (40%) of the amount recovered in the Federal case is hereby approved and allowed."

¶ 14    While that order finally determined that 40% of the recovery would be allocable to the lawyers collectively, how exactly to divide that allocation between the lawyers soon became the subject of hot dispute. This was brought to the attention of the probate court, which permitted the parties to fight that battle in a separate lawsuit that did not require the participation of Mr. Lopez's estate, provided that the $3.8 million "be deposited with the Clerk of the Circuit Court pending final adjudication of the dispute between the plaintiff's attorneys as to the division of attorney's fees between them." The probate court's order specified that Mr. Lopez's estate "shall not be a necessary party to the disputes between attorneys Carone, DeRose, DeRose, and Hubel, and said disputes shall be adjudicated separate and apart from the administration of the guardianship estate."

¶ 15    Which brings us to this lawsuit, filed by DeRose in the chancery division. DeRose claimed that neither Hubel nor Carone were entitled to the percentage of the fee award to which

they laid claim. As for Hubel, DeRose alleged the Referral Contract was void, because Hubel did not comply with the Code of Professional Conduct. As to Carone, DeRose made numerous allegations of misconduct and breach of contract.

¶ 16    The circuit court proposed a solution: Instead of a protracted civil case, the court would hold a summary evidentiary hearing, where it would make a final determination about the fees to which each attorney was entitled. Each of the parties agreed, and the court held the summary hearing.

¶ 17    Several witnesses testified at the hearing, including the parties and members of the Lopez family. Essentially, there were two competing accounts of the parties' agreement.

¶ 18    First, Carone and Hubel testified that the agreements were clear: Hubel would get her 30% off the top of the contingent-fee recovery, and DeRose and Carone would split the rest "50/50." DeRose, on the other hand, claimed the Referral Contract was unenforceable (meaning Hubel got nothing), and the agreement between Carone and DeRose was they would split the contingent fee 50/50 *only if they did equal work*. In other words, in DeRose's view, each of the attorneys were required to keep contemporaneous timesheets and would split the contingent fee proportionately to the amount of work done. DeRose also claimed that Caitlyn DeRose, an employee of the DeRose law firm who participated in the *Lopez* suit, was independently entitled to an award of fees separate and apart from John DeRose.

¶ 19    Following the hearing, the court issued a written order distributing the contingent fee of $3.8 million as follows: Hubel got 30% off the top, or $1.14 million; and DeRose and Carone equally split the remaining $2.66 million equally, or $1.33 million each.

¶ 20    The court first found, contrary to DeRose's argument, that DeRose and Carone had entered into a joint venture to litigate *Lopez* and split the contingent-fee recovery equally. The

court found the contracts "devoid of any condition or language" that based the split between

Carone and DeRose on the amount of work each performed. As a backstop, the court found that,

even if the agreements were ambiguous and required parol evidence, that evidence supported the

same conclusion—the parties intended an equal split of the recovery between Carone and

DeRose.

¶ 21    Above and beyond that, the trial court also made a factual finding that the respective

contributions of the co-counsel, Carone and DeRose, likewise rendered a 50/50 split "fully

reasonable and appropriate," and despite DeRose's claim that the split did not accurately reflect

the division of the work, there was "insufficient evidence for this Court" to agree with DeRose

on that point.

¶ 22    The court rejected DeRose's other arguments as well. The court found the Referral

Contract enforceable and Hubel's conduct compliant with the Rules of Professional Conduct.

Caitlyn DeRose, the court ruled, was an employee of the DeRose law firm, not additional

counsel, and thus she was not entitled to separate recovery under the agreements—she would

have to be compensated, like John, from the portion of the recovery allocated to the DeRose law

firm.

¶ 23    This timely appeal followed.

¶ 24                                    ANALYSIS

¶ 25    We should say at the outset that DeRose's opening brief is replete with claims of

improper conduct by the defendant attorneys, Carone and Hubel, as well as their associates and

employees. Most of these claims, however, are not tied to a theory for reversal of the judgment

or, for that matter, to any legal theory at all. We will not consider any such claims, as they are

accompanied by no case law or any discernible legal theory. See Ill. S. Ct. R. 341(h)(7)

(Appellant's brief must include an "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor."); *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 ("Mere contentions, without argument or citation to authority, do not merit consideration on appeal."). To the extent that claims of wrongdoing are tied to a theory of relief and a basis for reversal, however, we will obviously address them.

¶ 26    First, our standard of review, a critical aspect of a reviewing court's analysis but one on which DeRose, the appellant here, failed to comment, also in violation of Supreme Court Rules. See Ill. S. Ct. R. 341(h)(3) ("The appellant must include a concise statement of the applicable standard of review for each issues, with citation to authority, either in the discussion of the issues in the argument or under a separate heading placed before the discussion in the argument.").

¶ 27    As the court heard evidence and made certain findings of fact, we will not reverse those findings unless they are against the manifest weight of the evidence. *Eychander v. Gross*, 202 Ill. 2d 228, 251 (2002). The manifest-weight standard requires reversal only "when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id*. at 252. In contrast to its factual findings, the interpretation of the fee contracts is a question of law we review *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007).

¶ 28                    I.  Carone's Right to Half of Remaining Contingent Fee

¶ 29    We begin with the Contingent-Fee Contract that provided that the two attorneys trying the *Lopez* case, DeRose and Carone, would receive 40% of any recovery for the client, after Hubel took her 30% of the lawyers' share off the top.

¶ 30    DeRose claims that he is entitled to more than half of the remaining share to be divided with Carone, relying in part on Rule 1.5(e) of the Rules of Professional Conduct. See Ill. R. Prof. Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010). That rule reads as follows:

"A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer, or if the primary service performed by one lawyer is the referral of the client to another lawyer and each lawyer assumes joint financial responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable." (Emphasis added.) *Id*.

¶ 31 As part of our supreme court rules, Rule 1.5 has the force and effect of law. *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 21; *In re Vrdolyak*, 137 Ill. 2d 407, 421 (1990). The rule " 'embod[ies] this state's public policy of placing the rights of clients above and beyond any lawyers' remedies in seeking to enforce fee-sharing arrangements.' " *Donald W. Fohrman & Associates, Ltd. v. Mark D. Alberts, P.C.,* 2014 IL App (1st) 123351, ¶ 35 (quoting *Romanek v. Connelly*, 324 Ill. App. 3d 393, 399 (2001)). Simply put, Rule 1.5 is "designed to protect the client," which has always predominated over the lawyers' rights to recovery. *Id*. As such, "for any fee-sharing agreement to be enforceable, the attorneys involved in the agreement must strictly comply with Rule 1.5(e)." *Ferris, Thompson, & Zweig, Ltd. v. Esposito*, 2016 IL App (2d) 151148, ¶11, *aff'd*, 2017 IL 121297; accord *Donald W. Fohrman*, 2014 IL App (1st) 123351, ¶ 35 (Rule 1.5 requires strict compliance).

¶ 32 DeRose points to subsection (e)(1)'s requirement that the division of fees between counsel be "in proportion to the services performed by each lawyer." Ill. R. Prof. Conduct (2010) R. 1.5(e)(1) (eff. Jan. 1, 2010). He says he performed far more than half the services compared to his co-counsel, Carone, and thus he is entitled to more than half of the fee split.

¶ 33    But in reviewing this rule, which has been put front and center before us by the parties, we are more concerned with subsection (e)(2)'s requirement that "the client agree[] to the arrangement, *including the share each lawyer will receive*, and the agreement is confirmed in writing." (Emphasis added.) *Id*., §(e)(2). In our initial review, we flagged the question of whether the Contingent-Fee Contract violated subsection (e)(2), and because compliance with these rules are matters of public policy concerned with the protection of the client (a client whom, we would note, is not a part of this litigation), we asked the parties to address the question in supplemental briefing. See *Callen v. Akhter*, 66 Ill. App. 3d 421, 425 (1978) (appellate court may *sua sponte* consider legality of fee-splitting agreement as matter of public policy).

¶ 34    The Contingent-Fee Contract does not specify the fee split between Carone and DeRose after Hubel receives her 30% share off the top. After noting that Mr. Lopez was retaining both DeRose and Carone and referring to them collectively as "the Law Firms," the Contingent-Fee Contract provides that "the Law Firms shall be paid a contingent fee with respect to any amount recovered for *** the Client as follows: (a) Forty (40%) percent of any amount recovered."

¶ 35    This agreement specifies that 40% of the recovery will go to attorneys Carone and DeRose *collectively*, but Rule 1.5(e)(2) specifically requires that the written fee-sharing agreement "include[e] the share each lawyer will receive." Ill. R. Prof. Conduct (2010) R. 1.5(e)(2) (eff. Jan. 1, 2010). The Contingent-Fee Contract does not specify how the 40% is divided between DeRose and Carone—it does not specify the "share each lawyer will receive."

¶ 36    The case law is clear that the failure to specify in writing the share that each lawyer will receive renders the Contingent-Fee Contract non-compliant with Rule 1.5(e) and thus unenforceable under Illinois law. *Daniel v. Aon Corp.*, 2011 IL App (1st) 101508, ¶ 22; *Paul B.*

*Episcope, Ltd. v. Law Offices of Campbell & Di Vincenzo*, 373 Ill. App. 3d 384, 385–86 (2007);

*Thompson v. Hiter*, 356 Ill. App. 3d 574, 590 (2005).

¶ 37    In *Daniel*, we invalidated an agreement quite similar to the one before us. One of the

named plaintiffs in a class action, Williamson, hired three law firms to prosecute the action,

along with other law firms representing another named plaintiff. *Id*. ¶ 5. A written letter

agreement was drawn up between the three law firms representing Williamson (known in the

agreement as "Williamson's Counsel"), the other law firms representing a different named

plaintiff, and the named plaintiffs themselves. *Id*. ¶ 6. That letter agreement provided that, if the

plaintiffs prevailed at trial and the court awarded attorney fees to plaintiffs' counsel,

"Williamson's Counsel collectively will receive 15% off the top of the fees awarded to plaintiffs'

counsel in this action ***." *Id*..

¶ 38    After the lawsuit was successful and attorney fees were awarded, one of the three law

firms comprising the "Williamson Counsel" sued for its 5%—that is, a third of the 15% that

"Williamson Counsel" collectively was to receive. *Id*. ¶ 8. Though it did not appear that any

party raised the issue, we found it "appropriate for our analysis to consider" Rule 1.5(e). *Id*. ¶ 22.

We found the fee-sharing agreement violative of Rule 1.5(e)(2) because, while the agreement

specified how much the three law firms *collectively* were to receive, it did not spell out how each

of the three law firms were to divide up the money among themselves. *Id*. We refused to

"condone the violation and use the agreement as a basis of recovery" by one of the Williamson

law firms against the other two law firms. *Id*. ¶ 25.

¶ 39    In *Episcope*, 373 Ill. App. 3d at 385, the Episcope law firm (Episcope) entered into what

it styled a "representation agreement" with another law firm, DiVincenzo and Campbell (D&C),

to jointly represent a mutual client in a federal lawsuit, which had already commenced, but

which these two law firms would now enter as substitute counsel. The written agreement said nothing about the division of fees or responsibilities between the two law firms. *Id*. at 386. The two law firms agreed orally, however, to split fees equally. *Id*. at 385.

¶ 40    That federal lawsuit ended successfully in some respects for that client, including a $15 million recovery, but other possible defendants had been sued too late and were dismissed out on limitations grounds. *Id*. at 385-86. So the mutual client hired D&C to sue the original attorneys in the federal lawsuit for legal malpractice, which netted an additional $8 million recovery. *Id*.

¶ 41    Episcope filed suit to claim a portion of the attorney fees in that second, $8 million recovery, claiming that the representation agreement it signed with D&C included the second legal malpractice case in addition to the original federal lawsuit. The trial court entered summary judgment for D&C on the basis that, even if the representation agreement applied to that second malpractice lawsuit, the agreement violated the predecessor to Rule 1.5(e), what was then codified as Rule 1.5(f), which required a written fee-sharing agreement that disclosed:

> " '(1) that a division of fees will be made;
>
> (2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division; and
>
> (3) the responsibility to be assumed by the other lawyer for performance of the legal services in question.' " *Id*. at 392 (quoting 134 Ill.2d R. 1.5(f)).

¶ 42    We affirmed, finding that the representation agreement did not spell out the manner in which the fees would be divided between Episcope and D&C and thus was "void and unenforceable as a matter of law under Rule 1.5(f) ***." *Id*. at 391.

¶ 43    In doing so, we relied in part on a previous decision where we likewise found void and unenforceable a contingent-fee agreement that did " 'not disclose the terms of the oral fee-

sharing arrangement of the [co-venturer law firms] and hence [did] not comply with the disclosure requirements of Rule 1.5(f), which must be strictly enforced.' " *Episcope*, 373 Ill. App. 3d at 394 (quoting *Thompson*, 356 Ill. App. 3d at 590).

¶ 44    We also relied on *In re Storment*, 203 Ill. 2d 378, 398 (2002), a case involving disciplinary action against an attorney for violating the predecessor Rule 1.5(f) by not disclosing in writing to a client that he would split fees with his co-counsel in defending a drug prosecution. Though the client understood that each attorney would be compensated, our supreme court underscored the importance of reducing to writing the division of fees between co-counsel:

> "The writing must not only authorize a *division of fees*, but also set out the basis for the division, including the respective responsibility to be assumed and *economic benefit to be received by the other lawyer*. The requirement of a writing ensures that the scope and terms of each lawyer's representation are defined, thus preventing or minimizing uncertainties and disputes. [The client's] general understanding that both [lawyers] were to be compensated for their services does not fulfill the rule's mandatory writing requirement. For this reason, we cannot agree with the Boards' assessment of respondents' violation of Rule 1.5(f) as a mere technicality." (Emphasis added.) *Id*.

¶ 45    And while *Storment* was a disciplinary case and not one involving the validity of a fee-sharing agreement, we have relied on *Storment* in fee-sharing disputes to find that compliance with Rule 1.5(e) is mandatory and requires strict compliance. See *Donald W. Fohrman*, 2014 IL App (1st) 123351, ¶¶ 40-41; *Episcope*, 373 Ill. App. 3d at 392.

¶ 46    We would further note that the predecessor Rule 1.5(f) is no different in relevant part from the current Rule 1.5(e); the current version contains fewer conditions than its predecessor but retains the relevant one here of requiring that the division of fees between lawyers be

specified in writing. See *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 36. So our reference to cases under the predecessor Rule 1.5(f) is appropriate.

¶ 47    DeRose disputes the premise of our analysis, claiming that the Contingent-Fee Contract did, in fact, explicitly detail the split in fees between co-counsel DeRose and Carone. DeRose relies on language not contained in the Contingent-Fee Contract itself but in the third document relevant to this case, the "Addendum to Contingent Fee Contract Where Statutory Attorney's Fees May Be Awarded" that we previously mentioned. (See *supra*, ¶ 11.)

¶ 48    As an addendum to the Contingent-Fee Contract, DeRose is correct that it is part of and incorporated into the Contingent-Fee Contract, but that is not the problem. As the title of that document itself suggests, the Addendum was concerned only with statutory fees the lawyers might receive in a fee petition brought by counsel for a prevailing party in a federal civil-rights action pursuant to 42 U.S.C. 1988. Those fees have little to do with the client; they concern the attorney's hourly work on the case and compensating those attorneys who procure a victory for their civil-rights plaintiff clients for that hourly work *in addition to* any contingent-fee award they might obtain. See *Venegas v. Mitchell*, 495 U.S. 82, 90 (1990) ("section 1988 itself does not interfere with the enforceability of a contingent-fee contract.").

¶ 49    No question, DeRose is correct that the Addendum spells out that "the Law Firms will separately seek attorneys' fees for such representation, based upon the hourly time records its members keep, under the appropriate statute [section 1988] governing such litigation." But that has nothing to do with how the two different firms, Carone and DeRose, will split the contingent-fee award. Reference to language in the Addendum regarding section 1988 fees adds nothing to our analysis. The Addendum has nothing to do whatsoever with the contingent-fee recovery.

¶ 50    Carone, on the other hand, concedes that the Contingent-Fee Contract was silent on the split of fees between DeRose and Carone but points to the trial court's determination that a joint venture existed between the two firms. He thus argues that, even if the Contingent-Fee Contract did not spell out a division of fees, the law implies a fifty-fifty split among joint venturers.

¶ 51    The problem with that argument is that it is one of contract interpretation between the two attorney parties, and Rule 1.5 is not concerned with rules of construction. Rule 1.5, having the force of law, requires that the division of fees *not* be presumed or inferred but explicitly set forth in the fee-sharing agreement, for the protection of the client.

¶ 52    That's why we have consistently rejected the notion that the existence of a "joint venture" between the law firms, or any other presumption, may supply the necessary missing language explaining the split of fees between the different law firms. See, *e.g.*, *Donald W. Fohrman*, 2014 IL App (1st) 123351, ¶ 55 ("we reject Fohrman's argument that an equal split of responsibilities and fees must be presumed because the attorney-client agreements listed both attorneys," particularly given that such arrangement "would be contrary to the policy (protection of clients' interests) and strict requirements of Rule 1.5 ***"); *Daniel*, 2011 IL App (1st) 101508, ¶¶ 25 (rejecting joint-venture argument and requiring strict compliance with Rule 1.5(e)); *Episcope*, 373 Ill. App. 3d at 391 (even if joint venture agreement existed between parties, "the agreement would still be void and unenforceable as a matter of law under Rule 1.5(f)"); *Thompson,* 356 Ill.App.3d at 590 (invalidating oral fee-sharing agreement between joint venturers).

¶ 53    The parties also note that the client was aware of and agreed to a fifty-fifty split of fees between Carone and DeRose. That is true, but we are aware of no exception to Rule 1.5(e)'s requirement that a fee-splitting agreement be in writing, even if the client was aware of it orally. Indeed, one of the reasons for placing the fee-splitting arrangement in writing is that it reduces

the likelihood of disputes at the end of the case, which could prejudice a client caught in the middle of a quarrel that could tie up the proceeds of a settlement or verdict award. See *Storment*, 203 Ill. 2d at 398 ("The requirement of a writing ensures that the scope and terms of each lawyer's representation are defined, thus preventing or minimizing uncertainties and disputes."); *In re Spak*, 188 Ill. 2d 53, 67 (1999) (absent written contingent-fee contract, "[a] client in such a situation may be left with the unenviable choice of agreeing with his attorney's recollection of the free agreement or delaying receipt of his money pending resolution of a fee dispute.) Written disclosure is thus mandatory "even if *** the purposes of the rule were sufficiently served by the client's knowledge of the fee terms." *Storment*, 203 Ill. 2d at 398; *Spak*, 188 Ill. 2d at 67 (same).

¶ 54 Thus, the Contingent-Fee Contract cannot be enforced. The trial court's ruling that the agreement entitled Carone and DeRose to 50% each of the co-counsel's proceeds cannot stand.

¶ 55 II. Hubel's Right to Referral Fee

¶ 56 DeRose claims that Hubel is not entitled to her 30% of the contingent-fee recovery—for referring the case to Carone and DeRose—for various reasons, only two of which warrant extended discussion. First, DeRose says, Hubel violated Rule 1.5(e)(1) of the Rules of Professional Conduct by not assuming financial responsibility for the representation of Lopez. Second, she violated Rule 5.4 by improperly sharing her referral fee with her paralegal.

¶ 57 A. Rule 1.5(e)(2)

¶ 58 Before we get there, however, we must consider the argument on supplemental briefing that was dispositive above. We have just held that the Contingent-Fee Contract between Carone, DeRose, and the client was invalid. Does that ruling have any effect on the Referral Contract?

¶ 59 This case is unusual in that, unlike the other decisions on Rule 1.5(e) or its predecessor Rule 1.5(f), which involve either a referral agreement (*e.g.*, *In re Spak*, 188 Ill. 2d 53) or a fee-

sharing agreement between co-counsel (*e.g.*, *Daniel*, 2011 IL App (1st) 101508), here we have *both* a referral agreement *and* a fee-sharing agreement among trial co-counsel. If, as we have just held, the Contingent-Fee Contract between Carone and DeRose is invalid, does that affect the validity of the Referral Contract, under which Hubel gets 30% of the lawyers' share off the top?

¶ 60    Our answer is no. We say that, first, because the Referral Contract was a separate contract entered into between the client, Hubel, Carone, and DeRose. That contract neither discussed nor purported to discuss how Carone and DeRose would split their fees. The Contingent-Fee Contract and its addendum, which constituted the entire agreement for representation between the client, Carone, and DeRose, was a separate contract to which Hubel was not a signatory. Hubel had no say, and did not claim any say, in how the two law firms to which she referred the case would divide the fees between themselves.

¶ 61    Second, the Referral Contract, itself, complied with Rule 1.5(e)(2). The Referral Contract specifically explained that Hubel, as the "referring attorney[,] will receive Thirty (30%) percent of any attorneys' fees realized or recovered by" DeRose and Carone. The client was told to whom the case was being referred and how much of the fee Hubel would take as the referring attorney. The Referral Contract satisfied the letter and spirit of Rule 1.5(e).

¶ 62    As the Referral Contract was a separate agreement that complied with Rule 1.5, and because Hubel was not a party to the non-compliant Contingent-Fee Contract, we can think of no reason why the latter's violation of the rules should have any bearing on the Referral Contract.

¶ 63                                B.  Rule 1.5(e)(1)

¶ 64    Now to DeRose's arguments. DeRose says the Referral Contract violates two parts of Rule 1.5(e), italicized here:

"A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer, *or if the primary service performed by one lawyer is the referral of the client to another lawyer and each lawyer assumes joint financial responsibility for the representation*; (2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and (3) *the total fee is reasonable*." (Emphasis added.) Ill. R. Prof. Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010).

¶ 65    DeRose first claims Hubel did not "assume[] joint financial responsibility" (*id.*) for the *Lopez* suit, because she did not carry legal malpractice insurance coverage while that case was litigated. But "assuming joint financial responsibility" simply means assuming joint liability for the malpractice of the lawyers to whom the case was referred. *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 38 (provision intended to insure "that if one of the lawyers involved in the referral is sued for malpractice, the other will also be liable as would lawyers in a general partnership."); see also *In re Storment*, 203 Ill. 3d 378, 392 (2002) (provision under prior iteration of rule "refers only to potential financial responsibility for any malpractice action against the recipient of the referral.").

¶ 66    That is to say, had either DeRose or Carone been sued by the Lopez family for legal malpractice, Hubel, as the referring attorney, would have been jointly liable for that malpractice. And that's exactly how Hubel understood it; she testified that, in signing the Referral Contract, she had agreed to "buy [herself] into the case as if [she] were [the] attorney," meaning she "would be liable for any suit of malpractice" committed by Carone or DeRose.

¶ 67    No doubt, having legal malpractice insurance would help cover the cost of any such liability, and for that reason it would be ideal to carry it. As the circuit court wrote, "One could

- 17 -

make the argument that it is reckless to practice law without any such coverage." But Rule 1.5(e) says nothing about carrying professional liability insurance. Indeed, at the time and currently, no rule in Illinois requires lawyers to carry malpractice insurance; lawyers are currently obliged only to disclose *whether* they carry it. See Ill. S. Ct. R. 756(e) (eff. June 1, 2015) (when registering each year, "[E]ach lawyer [exceptions omitted] shall disclose whether the lawyer has malpractice insurance on the date of the registration ***. If the lawyer does not have malpractice insurance on the date of registration, the lawyer shall state the reason why the lawyer has no such insurance," which reason "shall be confidential.").[1]

¶ 68    So we reject any connection between Rule 1.5(e)'s requirement that a referring attorney assume joint liability for any malpractice committed by the referred attorneys, on the one hand, and whether the referring attorney has legal malpractice insurance, on the other. We agree with the circuit court that "[t]he logical corollary of [DeRose's] argument is that an attorney without malpractice coverage could never make a legal referral. That is simply not the law in Illinois."

¶ 69    In a final challenge related to Rule 1.5, DeRose claims that Hubel's recovery of over a million dollars violated Rule 1.5(e)'s requirement that her fee be "reasonable." Ill. R. Prof. Conduct (2010) R. 1.5(e)(3) (eff. Jan. 1, 2010). Her fee was substantial, yes, but that was because the recovery in the case—the case she referred to Carone and DeRose—was substantial. The Referral Contract entitled her to 30% of the recovery, and she received precisely that. DeRose has provided no legal support for the proposition that, due to various allegations of "unethical" behavior by Hubel—claims the trial court rejected, in any event—we should somehow find the

---

[1] Insofar as professional organizations dedicated to the practice of law are concerned, the Supreme Court Rules certainly encourage the carrying of professional liability insurance but still do not require it. See, *e.g.*, Ill. S. Ct. R. 721 (eff. July 21, 2017); Ill. S. Ct. R. 722 (eff. Mar. 15, 2004).

referral fee unreasonable and reduce her legal recovery. We have no basis to overturn the judgment below that the fee Hubel received was reasonable in amount.

¶ 70     In sum, we find no violation of Rule 1.5(e) insofar as the Referral Contract is concerned.

¶ 71                                C.  Rule 5.4

¶ 72     DeRose next argues that Hubel violated Rule 5.4(a) of the Rules of Professional Conduct by sharing her attorney fees with her paralegal, Elinor. Specifically, the evidence showed that Hubel promised Elinor a $50,000 bonus if the *Lopez* suit resulted in a favorable outcome.

¶ 73     Generally speaking, Rule 5.4(a) prohibits fee-sharing with non-lawyers. See Ill. R. Prof. Conduct (2010) R. 5.4(a) (eff. Jan. 1, 2010). There are many reasons for such a rule. For one, it prevents a layperson from recommending a lawyer not based on merit but for financial gain. See *Chandra v. Chandra*, 2016 IL App (1st) 143858, ¶ 26. For another, it removes lawyers' temptation to devote less time to a matter, knowing that they will recover only part of a fee that they must share. *Id.*

¶ 74     But subsection (a)(3) of the rule allows a lawyer to "include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement." Ill. R. Prof. Conduct (2010) R. 5.4(a)(3) (eff. Jan. 1, 2010).  That exception applies here. Hubel paid her employee a discretionary bonus at a time when the law firm was enjoying financial success. We agree with the trial court's view that it was nothing more or less than a generous gesture of appreciation to an employee. Whether that compensation is viewed as part of a "profit-sharing arrangement" or otherwise, that payment was proper under Rule 5.4(a)(3).

¶ 75     Imagine were it otherwise, and DeRose's interpretation carried the day. Rule 5.4(a)'s prohibition on "shar[ing] legal fees with a nonlawyer" (*id.*, § 5.4(a)) is not limited to contingent-

fee awards. It includes no limitation on the definition of "legal fees." And virtually every law firm in this state earns its money from legal fees of one kind of another—usually hourly rates, sometimes flat fees, if not contingent fees. If using that fee income to pay salaries to non-lawyer employees like assistants, paralegals, receptionists, investigators, technical assistants, human-resource personnel, bookkeepers, and the like constituted "shar[ing] legal fees with a nonlawyer," then not one law firm in this state could pay even simple *wages* to a single non-lawyer, much less bonuses. Needless to say, that proposition holds no water.

¶ 76    To all of that, we would add that we fail to see the relevance of this objection raised by DeRose, in any event. Even if Hubel's payment to her paralegal violated the rules (it did not), at most the result would be a disciplinary action against Hubel. Perhaps, hypothetically, it might be relevant to some legal dispute between Hubel and her paralegal over that payment. But it would have no impact whatsoever on the validity of the Referral Contract at issue, which is our only concern here. We firmly reject this argument.

¶ 77    We thus find no error in the trial court's judgment that Hubel was entitled to her full, 30% referral fee.

¶ 78                              III. Issues Relevant on Remand

¶ 79    A real question arises as to where things stand, in light of our disposition. We have just upheld the validity of the Referral Agreement and to Hubel's entitlement to 30% of the overall attorney recovery. On the other hand, we have invalidated the Contingent-Fee Contract and the determination of a 50/50 split between the co-counsel to whom the case was referred, Carone and DeRose.

¶ 80    Typically, if a fee-sharing agreement is invalidated, and thus the attorney has no contractual right of recovery, the attorney must resort to other remedies to seek payment for his

or her work on a case, such as *quantum meruit* or some other form of equitable relief. See, *e.g.*, *Johns v. Klecan*, 198 Ill. App. 3d 1013, 1019 (1st Dist. 1990); *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 984 (1987). And obviously, if attorneys have to resort to equitable remedies to recover for their work on a case, they may not get the same amount of money they would have received under the (invalid) contingent-fee contract. As a practical matter, they usually get less (here, of course, DeRose says he would get more).

¶ 81    But that brings us to another wrinkle that makes this case unique: Another judge, in another case, already fixed the amount of money to which the three attorneys, collectively, are entitled. Recall that a probate action was opened to administer Lopez's estate, and after the *Lopez* federal case settled, the probate judge entered a judgment awarding the attorneys "the contingency fee of forty percent (40%) of the amount recovered in the Federal case," or $3.8 million. (See *supra*, ¶¶ 13-14.) The probate court, acknowledging a dispute among the lawyers about the split of fees, placed the money in escrow and ordered the lawyers to file suit in another court—that would be this case—where the estate of Mr. Lopez "shall not be a necessary party."

¶ 82    We obviously have no jurisdiction to review that judgment awarding $3.8 million to the attorneys, as it was entered in another action by another trial judge. See *Busey Bank v. Salyards*, 304 Ill. App. 3d 214, 218 (1999). And it seems overwhelmingly likely at this stage that the probate court's judgment was a final judgment never appealed, which would make it *res judicata* for our purposes. *Id.*; *Application of Cook County Collector*, 228 Ill. App. 3d 719, 736 (1991).

¶ 83    If in fact that is the case, the trial court below will be facing a situation where the pot of money, so to speak, has already been established—that of $3.8 million. As we have upheld the Referral Contract and Hubel's right to 30% off the top, Hubel would be entitled to precisely what

the trial court awarded her, $1.14 million. The remaining $2.66 million would need to be split in some fashion between Carone and DeRose.

¶ 84 We should emphasize here that we do not have all the information we require to determine that the probate court's judgment was a final judgment that was never appealed. That information is beyond our record. However likely that appears to be the case, the trial court should make that determination when the parties return on remand.

¶ 85 But if in fact that amount of money is set in stone, as we suspect, what will be left to determine is how much of $2.66 million goes to DeRose, and how much to Carone. We cannot know what legal claims Carone will assert. We know that DeRose's amended complaint stated claims for *quantum meruit* and account stated, but neither of those claims were ever litigated, the parties opting instead for a summary evidentiary hearing based on the fee agreements.

¶ 86 We know this much, however. After a thorough evidentiary hearing, the trial court, to its credit, entered extremely detailed findings of fact in its written judgment order. Among those findings was its determination that Carone's and DeRose's respective contributions to the *Lopez* case warranted a 50/50 split of the fee award. (See *supra* ¶ 21.)

¶ 87 In the interest of judicial economy, because a full evidentiary hearing with judicial findings of fact have been made, we will review those factual findings in the event it would assist the proceedings on remand. It would make no sense, and do nothing but waste judicial resources, to require the trial court to retry an issue it already adjudicated. As noted, we uphold a trial court's factual findings unless they are against the manifest weight of the evidence—that is, unless the opposite conclusion is clearly evident. *Eychander*, 202 Ill. 2d at 251.

¶ 88 The trial court broke down the contributions of DeRose and Carone as follows:

"There is no doubt that DeRose is more experienced than Carone in the litigation of civils rights and/or police misconduct cases. There is also no question that DeRose and Caitlyn DeRose were heavily involved in the prosecution of the underlying case. However, Carone was clearly involved in the case, despite Plaintiffs' efforts to minimize Carone's contributions. In fact, the evidence established that Carone was actively involved in all aspects of the case and made significant contributions to the underlying litigation. For example, when the underlying trial was imminent, both Carone and DeRose spent several weeks preparing for the trial, including dividing up witnesses that each attorney was to examine during trial. At the conclusion of the bifurcated trial, Carone gave the closing argument. Although the parties entered into the settlement prior to the conclusion of the trial's damages phase, it was clear to this Court, based upon Carone's credible testimony, that Carone believed that he was fully prepared and ready to give the closing argument as to the issue of damages prior to the time that the case settled. Carone's involvement was obviously instrumental in obtaining the outstanding settlement. With that being said, it was clear to this Court that DeRose also did an amazing job in developing the case and preparing for trial. The Court suspects that DeRose's rather unique, if not outright quirky style, played a large role in persuading the jury to find in favor of Lopez."

¶ 89    Thus, the court found, it was "fully reasonable and appropriate for Carone and DeRose to receive the 50/50 split after the 30% deduction to Hubel. This finding is based on the clear and unambiguous terms of the contingent-fee contract, *along with the attorneys' respective contributions in the underlying case*. There is insufficient evidence for this Court to conclude otherwise." (Emphasis added.)

¶ 90    We have no basis to find that the trial court's determination was so unreasonable or arbitrary that the opposite conclusion was clearly evident. The evidence showed not only that Carone performed a healthy share of the work but, in addition, that he fronted all of the costs in the case—no small service—to say nothing of the fact that Carone was the attorney who brought in DeRose to litigate the case with him. Rule 1.5(e)(1) clearly envisions the referral of a case to constitute a "service" itself. See Ill. R. Prof. Conduct (2010) R. 1.5(e)(1) (eff. Jan. 1, 2010) (referring to the "referral of the client to another lawyer" to be a "service" itself). DeRose never would have been part of this case had Carone not brought him in, and that is not something to be entirely discounted.

¶ 91    The testimony was conflicting, but the trial court sorted through it and found a 50/50 split to be consistent with the parties' respective contributions to the *Lopez* case. We have no basis to overturn that determination. In the event, as we suspect, that this issue will be relevant to the resolution of the case on remand, we uphold this factual determination by the trial court.

¶ 92                          IV. Motion for Sanctions

¶ 93    While the case was pending in this court, Carone filed a motion for sanctions against DeRose pursuant to Illinois Supreme Court Rule 375. In the motion, Carone argues that DeRose's appeal was frivolous, not so much on the merits but because the parties "agreed" to appeal only certain aspects of the case. Specifically, he argues that the parties agreed that they "would be bound to the factual findings and conclusion of law" made by the trial court, and thus DeRose knew that "an appeal of Judge Mullen's findings and order would be meritless, unless the ruling was against the manifest weight of the evidence or an abuse of discretion."

¶ 94    We find no basis for sanctions. The parties agreed to be bound in the trial court to the court's findings after the summary evidentiary hearing—that the case would conclude in the trial

court after that hearing and disposition—but the trial court was adamant and perfectly clear with the parties that they had every right to *appeal* all or any portion of the trial court's judgment with which they disagreed. And yes, to the extent that factual findings were at issue, a deferential standard of review would apply on appeal, but that is a far cry from them being non-reviewable.

¶ 95    We thus deny the motion for sanctions.

¶ 96                                    CONCLUSION

¶ 97    In sum, we uphold the Referral Agreement and Hubel's right to 30% of the amount of attorney fees recovered. If the trial court confirms that the probate order that granted the sum of $3.8 million to the attorneys is a final and non-appealed order and thus *res judicata*, Hubel is entitled to 30% of that $3.8 million, as the trial court previously awarded her. Otherwise, Hubel will be entitled to 30% of whatever amount the trial court determines to be the proper overall fee allocated to the attorneys.

¶ 98    We hold invalid the Contingent-Fee Contract, and neither Carone nor DeRose has the right to recover attorney fees pursuant to that agreement. We express no opinion on the non-contractual remedies the parties may seek, as those claims are not before us. But for the purpose of judicial economy, we have reviewed and uphold the trial court's determination that the division of actual work and services performed by Carone and DeRose justified an even, 50/50 split of attorney fees, as that factual determination was not against the manifest weight of the evidence.

¶ 99    The trial court's judgment is vacated, and the cause remanded for further proceedings consistent with our judgment and instructions. The motion for sanctions is denied.

¶ 100   Vacated and remanded with instructions.

¶ 101   Motion for sanctions denied.